208 So.2d 249 (1968)
The CITY OF MIAMI, Florida, Petitioner,
v.
FLORIDA PUBLIC SERVICE COMMISSION, and Southern Bell Telephone and Telegraph Company, Respondents.
The CITY OF MIAMI, Florida, Petitioner,
v.
FLORIDA PUBLIC SERVICE COMMISSION, and Florida Power & Light Company, Respondents.
Nos. 35978, 35994.
Supreme Court of Florida.
January 15, 1968.
As Revised on Denial of Rehearing March 27, 1968.
*250 Jack R. Rice, Jr., City Atty., and Sam Daniels, Miami, Special Counsel for City of Miami, petitioner.
William C. Steel, Phillip Goldman, Scott, McCarthy, Steel, Hector & Davis, Miami, James H. Sweeny, Jr., DeLand, and Sidney Hoehl, Coral Gables, for Florida Power & Light Co.
Harold B. Wahl, Loftin & Wahl, Jacksonville, William C. Lantaff, John H. Wahl, Jr., Walton, Lantaff, Schroeder, Carson & Wahl, Miami, Nathan H. Wilson, Jacksonville, Jefferson Davis, and Drury B. Thompson, Atlanta, Ga., for Southern Bell Telephone and Telegraph Co.
Lewis W. Petteway, Tallahassee, for Florida Public Service Commission.
ERVIN, Justice.
Petitioner, the City of Miami, Florida, seeks judicial review by certiorari of Orders 4076 and 4078 of the Florida Public Service Commission relating to the rates, charges and earnings of, respectively, Southern Bell Telephone and Telegraph Company and Florida Power & Light Company. Upon certiorari granted, the two cases were consolidated for oral argument pursuant to motion of the Petitioner. Due to the fact that the basic issues in both cases involve common questions of law, we have consolidated them for purposes of review and decision.
General Services Administration, a protestant with Petitioner in the original hearings, did not petition us for review.
Some background facts involved in the instant consolidated cases are related as follows:
On November 30, 1964 the Florida Public Service Commission issued an order fixing January 18, 1965 as the date for commencement of hearings on the justness and reasonableness of the rates and charges of Southern Bell Telephone and Telegraph Company for intrastate service in the State of Florida. The Commission on December 4, 1964 issued an order fixing January 28, 1965 as the date for commencement of similar hearings regarding the justness and reasonableness of rates and charges of Florida Power & Light Company. The purpose and reason for each of the orders was to hear
"* * * all interested parties who desire an opportunity to testify concerning the rates, charges, and earnings * * * as well as the rate-making practices, policies, *251 and philosophies under which said public utility operates and prices its services, so that the Commission may be fully advised in the premises and, on the basis of all the testimony in this proceeding, establish a proper rate base, depreciation rates, and rate of return for said utility and make whatever rate adjustment, if any, may be appropriate and in the public interest."
After a number of public hearings were held in each case, producing more than 5,000 pages of testimony and in excess of 400 documentary exhibits, the cases were submitted to the Commission, which determined as follows:
Regarding Southern Bell Telephone and Telegraph Company, on October 26, 1966 the Commission issued Order No. 4076, the basic import of which is as follows:
"* * * we specifically find that the rates and charges of Southern Bell Telephone and Telegraph Company are unreasonably high to the extent that annual gross revenues for the test year, on an annual basis at the end of said period, resulted in earnings in excess of 6.80% when applied to the adjusted year-end net investment rate base which we have found to be $478,530,895; that said excess earnings, restated on a gross revenue basis, amount to the sum of $3,741,885 after having deducted $1,192,000 for income tax savings previously passed on to the Company's rate payers; and that the Company's gross revenues for the test period, adjusted to the year-end basis, should be reduced by said amount of $3,741,885."
Regarding Florida Power & Light Company  on November 2, 1966 the Commission entered Order No. 4078, the basic import of said order being:
"* * * we specifically find that the rates and charges of Florida Power and Light Company are excessive and unreasonably high to the extent that annual gross revenues for the test year, on an annual basis, resulted in earnings in excess of 6.95% when applied to the adjusted year-end net investment rate base which we have found to be $637,826,667; that said excess earnings, restated on a gross revenue basis, amount to the sum of $7,973,000; and that the Company's gross revenues for the test year should be reduced by said amount of $7,073,000."
Petitioner contends that in both cases the Commission should and would have ordered a much greater reduction in rates if due consideration had been given the applicable law and admitted facts. Specifically, Petitioner contends that in both orders the Commission departed from essential requirements of law by doing or allowing the following:
A. Computing rate base at the end of the test year rather than on the average investment during the twelve-month period.
B. Making only a 20% deduction for federal income tax accruals.
C. Allowing the companies concerned to make charitable contributions with consumer monies.
D. Allowing each company to retain its excessive charges rather than making the reduction orders retroactive.
E. Erred in the determination as to the fair rate of return on invested capital of each company.
We preface our discussion of the aforementioned points with the following general proposition regarding judicial review of utility rates:
"* * * When a case arises in which it becomes necessary to determine whether a properly established rate is a reasonable or constitutional one, either to protect the public against excessive or unreasonable charges or to protect a public utility against the infringement of its constitutional rights and rates which are so low as to amount to confiscation or deprivation of its property, the courts may determine the reasonableness of such *252 rates and may enjoin the enforcement of an unjust, unreasonable, or confiscatory rate ...
"* * * However, the duty of courts with respect to rate making is merely to inquire concerning results; and where the issue is whether rates prescribed by public authority are confiscatory, the court is not bound to accept the findings of the rate-making authority, though they are supported by substantial evidence, but may exercise its independent judgment upon the facts." 43 Am.Jur., Public Utilities and Services § 185, pp. 693-695.

REGARDING POINT A:
In both cases Petitioner contends that while it has no quarrel with the test period adopted by the Commission, it does most vigorously take exception to the computations of rate base at the end of the test year selected by the Commission which extended from October 1, 1963 to September 30, 1964, rather than on the average investments during the twelve-month period. Petitioner argues that the soundest and most reliable method of computing a utility's earned rate of return is to relate the average rate base during the test year to the actual earnings produced by that rate base. In the briefs Petitioner asserts that "most regulatory bodies, both State and Federal" employ this average investment method, and further argues "that the radical departure below from such a well established method * * * was a clear departure from the essential requirements of law." In both orders reviewed the Florida Public Service Commission sets forth some of the policy reasons and factors supporting utilization of the year-end rate base as follows:
"Since 1953 this Commission has used year-end investments as the starting point in calculating the rate base. In 1953 Florida had already begun its surge forward in population growth and economic development. New industries were moving in and the State found itself bounding ahead on all fronts. At that time Florida public utilities were striving to keep pace with the pyramiding demands for service. They were confronted with the task of securing hundreds of millions of dollars in order to finance the necessary expansions so that they could keep pace with Florida's mounting economic boom. It was at that time that this Commission determined that it was in the public interest to depart from its traditional use of average year investment in calculating the rate base when fixing rates for public utilities engaged in extraordinary expansion programs. * * *
"In Florida the year-end rate base is permissible under the statutes and controlling court decisions. Its use should be determined by the necessities and circumstances existing when the determination is made. The growth problems that existed in 1953, when its use was first adopted by this Commission, have not abated, but on the contrary, have increased and are even more pronounced at this time. * * *
"We are firmly convinced that terminal or year-end investment, under all the circumstances of this case, should constitute the starting point in calculating the rate base on which the respondent, Southern Bell Telephone and Telegraph Company [and Florida Power & Light Company], will be allowed to earn a fair and reasonable return. Continued growth, and the accompanying demands for more and more telephone [and electric] service by the increasing population, businesses and industries * * * are real facts in this case and demand a better answer than anyone has advanced who would have this Commission revert to a philosophy that is incapable of meeting the demands of a booming economy."
Sections 364.14 and 366.06, Florida Statutes, F.S.A., deal with the procedures for fixing and changing rates, charges, tolls, *253 etc., of telephone and telegraph companies and public utilities, respectively. F.S. Section 364.14, F.S.A., reads in part:
"Whenever the commissioners shall find, after a hearing had upon their own motion or upon complaint, that the rates, charges, tolls or rentals demanded, exacted, charged or collected by any telegraph company or telephone company * * * are unjust, unreasonable, unjustly discriminatory or unduly preferential * * * or that such rates * * * are insufficient to yield reasonable compensation for the service rendered, the commissioners shall determine the just and reasonable rates * * * to be thereafter observed and in force, and fix the same by order as hereinafter provided."
Section 366.06(2), Florida Statutes, F.S.A., states that in determining rate base for public utilities the Commission
"* * * shall investigate and determine the actual legitimate costs of the property of each utility company, actually used and useful in the public service, and shall keep a current record of the net investment of each public utility company in such property which value, as determined by the commission, shall be used for rate-making purposes and shall be the money honestly and prudently invested by the public utility company in such property used and useful in serving the public, less accrued depreciation * * *" (Emphasis added.)
It is quite apparent these statutes repose considerable discretion in the Commission in the rate-making process.
In 1953 a basic policy pronouncement was made by the Commission in Re Florida Power Corp., 99 P.U.R. 129, from which we quote as follows:
"In normal times and under stable conditions the amount of revenue required to produce a fair rate of return can generally be calculated accurately and equitably upon the average and not the year-end balances of the test year. On the other hand, where a utility is in the throes of unusual growth and confronted at the same time with constantly increasing investment and operating costs, conventional notions of rate making must be adjusted to the circumstances and this is especially true where net earnings fail to keep pace with heavy additions made and to be made in plant investment. Where there is little fluctuation in a utility's investment accounts from the beginning of the year to the end of the year, we believe that the rate base should be predicated upon the net average investment for the test period. We have followed that method consistently for many years and will continue to do so whenever and wherever the investment accounts disclose nothing more than a normal growth. * * * There seems to be only one sound objection to the use of the year-end rate base and that is that some additional revenues must be ascribed to plant additions; however, this would be largely offset by the factors of additional depreciation, taxes, and expenses, so that there is little, if any, danger of excessive compensation. Under present conditions, as disclosed by the record herein, we conclude that the year-end rate base is more realistic than the average investment rate base. Inasmuch as we are here fixing rates for the present and for a reasonable time in the future, we should not use an investment figure that is already more than a year old." (at 134-135)
Upon thorough study of the authorities cited by all parties, we conclude that, to borrow the above quoted words of the Commission, "under present conditions, as disclosed by the record herein * * * the year-end rate base is more realistic than the average investment rate base." (Emphasis supplied.) The voluminous testimony and exhibits of the transcript of record and the detailed discussion by the Commission on the totality of the evidence and circumstances leading to the *254 determinations in Orders 4076 and 4078 bear out and support our decision to uphold both orders as to the rate base concept.
We will not unduly burden this opinion with verbatim recitations of the total scope of determinative factors leading to the choice of rate-making method in the instant cases. We will, however, set forth some of the basic factors involved in each case which were influential in the determination of both orders. In Order 4076 the Commission made the following observations in regard to Southern Bell Telephone and Telegraph Company:
"In Florida, Southern Bell operates in 26 counties, serving almost 2,000,000 telephones through 95 local exchanges. Its largest local exchange is in the City of Miami where it has 325,298 stations in service. Southern Bell serves the entire east coast section of Florida from Jacksonville to Key West. Its service area includes several exchanges in central, north, and west Florida; and it provides telephone service in such population centers as Pensacola, Jacksonville, Daytona, Orlando, Fort Lauderdale, and Miami. The company also serves several large and important air and naval bases in the State and the tremendous space complex in the Cape Kennedy section.
* * * * * *
"* * * In 1951, Southern Bell's telephone plant in service in Florida was $149,927,240 and at the end of the test period, September 30, 1964, it was $736,530,921, or an increase of approximately 400%. The Company had a large backlog of held orders, more than 32,000 people were clamoring for telephone service they could not get, mostly in the Miami area, which then as now was enjoying phenomenal growth. At the end of the test period in the present case, the Company was installing telephones through its service area on a current basis. In 1951 Southern Bell still had many exchanges which had not been converted to dial operation, and direct-distance dialing by subscribers was still a long way off. Today all the company's exchanges are dial operated, and a substantial majority of its subscribers have Extended Area Service and can dial their own long distance calls. These records of growth and expansion reflect the service demands that had to be met if the public was to have the service it needed and was entitled to receive. Such progress on the part of a state's public utilities also reflects a regulatory philosophy that is responsive to the economic demands of a growing section. The philosophy of this Commission has been, and will continue to be, to support and encourage the growth and prosperity of all sections of Florida so long as that can be done without imposing unreasonable and exorbitant rates upon the public. The past several years, and the rate reductions imposed on public utilities when their earnings have become excessive, furnish adequate support of this Commission's constant awareness of the earnings requirements of utilities under its jurisdiction, as well as the Commission's dedication to the principle of keeping all public utility rates within the zone of reasonableness."
Regarding Florida Power & Light Company, the Commission related the following in Order No. 4078:
"Florida Power and Light Company, with its principal business offices located * * * in Miami, Florida, is the public utility involved in this investigation. It is a Florida corporation operating as an integrated public utility engaged exclusively in the intrastate business of generating, purchasing, transmitting, distributing, and selling electric energy to the public for compensation; and for that purpose owns and operates generating plants substations, transmission lines, and distribution systems in various parts of the State of Florida. The utility operates in Dade, Broward, Palm Beach, Hendry, Lee, Charlotte, Glades, Highlands, *255 Sarasota, Manatee, Hardee, DeSoto, Hillsborough, Collier, Martin, Okeechobee, St. Lucie, Indian River, Brevard, Seminole, Volusia, Flagler, Alachua, Bradford, Putnam, St. Johns, Clay, Union, Columbia, Suwannee, Baker, Nassau, and Duval Counties. Its service area includes such population centers as Miami, Miami Beach, Fort Lauderdale, West Palm Beach, Daytona Beach, Sarasota, Fort Myers, Bradenton, Palatka, and Lake City. It also serves several large defense areas including Homestead Air Force Base, Patrick Air Force Base, and the tremendous space complex in the Cape Kennedy section.
"Florida Power and Light serves probably the fastest growing territory in the United States. This public utility has been a major contributing factor in the unprecedented growth of Florida's east coast section. It has done an outstanding job in meeting the ever increasing demands from the public for more and more electric energy for residential, commercial and industrial use. While the territory served by Florida P & L has grown by leaps and bounds, the utility itself has also experienced a strikingly similar and remarkable growth. At the end of 1951, when it first came under the jurisdiction of this Commission, this utility served 328,000 customers and had a gross total plant investment of $180,000,000. By the end of 1965, under State regulation, it had increased its gross plant investment to $900,000,000 and presently serves approximately 1,000,000 customers. Gross electric revenues for 1951 were $53,000,000, but for 1965 they were $250,000,000. For 1951 total Kwh sales amounted to one billion six hundred million, whereas by 1965 they had climbed to twelve billion one hundred million. During this period of rapid growth and expansion this Commission, under its policy and practice of continuing surveillance, required Florida P & L to reduce its rates by $4,725,000 in 1957; $2,864,000 in 1959; by $260,000 in 1960; $6,256,000 in 1961; $10,000,000 in 1964; $3,741,743 in 1965; and $9,467,900 effective January 1, 1966. Thus, since coming under the jurisdiction of this Commission, the rates of this particular electric utility have been reduced $37,314,643 on an annual basis."
Thus, in view of the particular circumstances and facts involved, we can not agree with Petitioner's assertion that the method employed by the Commission to compute the rate of return of the two companies involved was "so plainly irrational, incongruous, arbitrary and capricious as to constitute a flagrant abuse of discretion. * * *"
Another factor to be considered and one lending further support to the method selected by the Commission for determining rate base, is the concept or principle known as the "end result" rule. This concept was originated in the case of Federal Power Commission v. Hope Natural Gas Co. (1944), 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333. There the Supreme Court of the United States, reviewing a rate reduction order of the Federal Power Commission, said
"We held in Federal Power Commission v. Natural Gas Pipeline Co., supra, 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037, that the Commission was not bound to the use of any single formula or combination of formulae in determining rates. Its rate-making function, moreover, involves the making of `pragmatic adjustments.' * * * And when the Commission's order is challenged in the courts, the question is whether that order `viewed in its entirety' meets the requirements of the Act. * * * Under the statutory standard of `just and reasonable' it is the result reached not the method employed which is controlling. * * * It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the *256 method employed to reach that result may contain infirmities is not then important. Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences. * * *" (at 602, 64 S.Ct. at 287)
This "end result" doctrine was adopted in Florida in the case of Jacksonville Gas. Corp. v. Railroad & Public Utilities Comm. (1951), Fla., 50 So.2d 887, in which this Court, speaking through Mr. Justice Thomas, said:
"It was the commission's view that it should be `free to follow such method * * * as (it) may choose so long as the end results are rates which are just and reasonable.' * * * At first we were disposed to criticize such reasoning because we thought one could not evaluate a conclusion without examining the course followed in reaching it; in other words, the product of .07X could not be judged properly without isolating and defining `X'. But upon further study we became convinced that the `end result' is to be weighed in terms of justness and reasonableness, having consideration for all circumstances that in the sphere of finances affect and influence investments of this sort. This so-called `end result' is made fluctuant by the variant in percentage and the flexibility of justness and reasonableness.
"From an intense study of this litigation in the light of applicable statutes and decisions dealing with the subject, it is patent that the criterion, as indistinct and inexact as it may be, is the justness and reasonableness of the earnings to be computed. The qualifications are ever present, and it is rates of this character that the utility board is charged with finding." (at 892) (All italicized in original.)
Later, in 1959, we reaffirmed the "end result" concept in the case of General Telephone Co. v. Carter, et al., Fla., 115 So.2d 554, wherein we said, speaking through the late Mr. Justice Hobson:
"* * * Our disposition of these issues is controlled by this Court's position originally adopted in the case of Jacksonville Gas Corporation v. Florida Railroad & Public Utilities Commission, [(1951) Fla., 50 So.2d 887] wherein we pointed out that the Commission in rate cases is free to follow such methods as it may choose so long as the `end result' of such methods is the establishment of just and reasonable rates and so long as such methods do not go so far astray that they violate our statutes or run afoul of constitutional guarantees.
"Thus, we hereby reaffirm our adoption of the `end result' test * * *." (at 559)
Thus, it is our considered judgment that Petitioner has failed to make a showing that the rate base method employed by the Commission in the instant two cases resulted in unjust and unreasonable effects. We do not, however, intend by this opinion to give blanket-type approval to, or adopt as a standard procedure or method, the year-end rate base. Rather, we would borrow language used by the Tennessee Public Service Commission in the case of Re Inter Mountain Teleph. Co. (1965), 59 P.U.R.3d 337, which reads:
"The adoption of the above items in these proceedings does not preclude their exclusion and use of the average rate base in future proceedings in which the company is not faced with extraordinary demands for expansion of its service facilities." (at 344)
The "end result" doctrine was never intended to justify improper or erroneous methods or factors in the rate-making *257 process. It operates to neutralize such irregularities where they do not appear to be serious enough to produce harmful effects in the final determination of a fair and reasonable return. Applied to the instant cases the doctrine operates to help neutralize the dispute over whether the year-end test or the average investment during the year should have been used. For example, even if the rate bases ascertained by use of the year-end test are inflated, the percentages fixed by the Commission to be applied to such rate bases to produce fair returns may be low enough to offset the inflated rate bases. At this point, we reiterate careful inspection of the record in these cases does not disclose competent and substantial evidence contrary to the findings of the Commission that the percentages of return allowed are neither confiscatory to the utilities nor excessive or exorbitant to their subscribers and consumers. Nevertheless, we are not happy that resort to the "end result" doctrine is necessary in order to conclusively determine this disputed issue. We fear "end result" can tend to discourage use of proper yardsticks in determining rate base and encourage unsystematic rate making. See 73 C.J.S. Public Utilities § 17, pp. 1013 et seq., both text and annotation. Year-end test if used without regard to the reality of an exceptional or abnormal condition can produce an exaggerated rate base.
Under controlling rules of law we cannot substitute our judgment for that of the Commission in regard to its administrative determination to use the year-end test for ascertaining rate base  nor can we disregard precedent that the rule of "end result" may render harmless the year-end method. In future rate cases before the Commission the advisability of using particular test methods and criteria over others for rate base determinations may be more scientifically ascertained due to the evolution of the rate fixing process and the trend of rate decisions. It may not be necessary in such cases to fall back on "end result" to wash out erroneous administrative methods, mistakes and judgments in the rate-making process. An example of a rather egregious mistake in this case is pointed out by the Petitioner and confirmed by the record. The Commission made a mathematical error of $108,356 in computing excess net earnings of Florida Power & Light Company, but since the factors making up its rate base were found to total $637,826,667, upon which a fair return of 6.95% was allowed, the error in these large calculations is de minimus under the "end result" rule on the theory it may have helped offset possible mistakes unfavorable to the Company. "An excessive allowance by a rate-fixing body for a particular rate factor does not necessarily invalidate the rate fixed. Such an allowance as to one factor may, when the rate is judicially reviewed, compensate for error in others." 43 Am.Jur., Public Utilities and Services, § 160, p. 677.
We note the 1967 Legislature has given the Commission some financial relief by providing it additional regulatory trust funds (Ch. 67-300, Item 928), as well as some additional utility regulatory authority (Ch. 67-326). This augurs well for the Commission in the discharge of its rate-fixing function and hopefully indicates a continuing legislative disposition to make it possible in approaching decades for the Commission to be adequately staffed and equipped so that it can regularly and systematically, through the aid of competent experts and data collecting equipment, evaluate the rate bases of public utilities, their operating expenses, their capital outlay needs, including financing and other features incident to determining fair and reasonable rates, as well as permit the Commission to keep abreast of rate practices in other jurisdictions in order that the public utilities in our state will be accorded fair and reasonable returns on their investments and consumers and patrons fair and reasonable rates.[1]
*258 We wish to make it clear that in not disturbing the use of the year-end method which was utilized by the Commission in fixing rates in these cases rather than average investment during the test year, we do so because of the strong unrebutted evidentiary showing that the two utilities are endeavoring to cope with extraordinary needs for their services due to abnormal population and economic growth conditions within their service areas. The Commission did not find the proliferation of subscribers and consumers due to increased population and economic growth had the effect of increasing the earnings of the two utilities to the point where a year-end rate base was unnecessary.
Concluding our discussion on this point, it is our belief that in the absence of the most extraordinary or emergency conditions or situations, average investment during the test year should be the method employed by the Commission in determining rate base. Our study of the subject discloses that average investment during the year is the better choice of methods and we commend it to the Commission in future cases  and suggest it should not be departed from except in the most unusual and extraordinary situations where not to do so would result in rates so low as to be confiscatory to the utility. See Re Montana-Dakota Utilities Co. (N.D. 1960), 102 N.W.2d 329; Narragansett Electric Co. v. Kennelly (R.I. 1958), 88 R.I. 56, 143 A.2d 709; Re North Carolina Gas Service Div. (North Carolina Utilities Comm. 1961), 41 P.U.R.3d 91, 101-102; and Re Niagara Mohawk Power Corp. (New York Public Service Comm. 1960), 35 P.U.R.3d 149.

REGARDING POINT B:
In both cases Petitioner makes the assertion that the Commission should have deducted from the rate base 50% of the utility's federal income tax accruals for the test period. Instead, complains the Petitioner, the Commission "arbitrarily deducted only 20% of such taxes" from the rate bases of both companies. We find no support for Petitioner's pronouncement that the Commission "arbitrarily" deducted only 20% of federal income tax accruals. Our examination of the records leads us to conclude that the Respondents logically, legally and successfully counter this contention by the following arguments in their briefs:
"Prior to the investigation of this case, the Commission did deduct 50% of federal income tax accruals. The 50% deduction was the result of a study by the Commission prior to 1964 and before the income tax rate was reduced and the method of payment accelerated. There is nothing in this record, except custom, which would support a deduction of 50% of such tax accruals. The 20% deduction was developed in the light of currently effective requirements concerning the payment of federal income taxes.
"The Commission's deduction of 20% of the test year * * * accruals * * * is supported by substantial competent evidence in the record. More than that, the City's position on this matter can not stand the `end result' test."

REGARDING POINT C:
This point concerns the alleged departure from essential requirements by the Commission in allowing the two companies involved in the instant cause to make charitable contributions and deduct the same as operating expenses. In Orders 4076 and 4078 the Commission made the following statements:
"We recognize that there is a diversity of treatment of this issue by regulatory agencies. Some allow charitable contributions as an operating expense; some do not. Some courts have approved the allowance; others have approved the disallowance. In our opinion, charitable contributions are a part of the utility's cost of doing business. Utilities are fair game for those who solicit contributions on behalf of a community's charities... . So long as the contributions are *259 reasonable in amount, we consider that they are properly chargeable to operating expenses for rate-making purposes."
The Commission is quite correct in its observation in the instant cases that there is diversity of opinion and treatment on the matter of charitable contributions by utilities companies. Research fails to disclose any decision or determination by this Court on this particular point. The Commission, however, in 1962 said in the case of Re General Telephone Co. of Florida, 44 P.U.R.3d 247, that
"public utilities must be good citizens and the public expects contributions such as these. It would be rather a strained construction to say that such items, in reasonable amounts, are not a permissible part of the operating costs of a public utility." (At 254; emphasis added.)
Likewise, the Federal Power Commission said in 1964 in the case of Re United Gas Pipe Line, 54 P.U.R.3d 285:
"We believe that contributions of a reasonable amount to recognized and appropriate charitable institutions constitute a proper operating expense. Corporations have an obligation to the communities in which they are located and they are expected to recognize this obligation. It is our opinion that these contributions have an important relationship to the necessary costs of doing business. (At 295; emphasis added.)
We are of the opinion that the better concept on this matter is that set forth by the Florida Public Service Commission in Re General Telephone Co. of Florida, supra, and by the Federal Power Commission in Re United Gas Pipe Line, supra. Namely, if contributions are of a reasonable amount to recognized and appropriate charities, then they may be classified as legitimate operating expenses. Petitioner herein fails to make any conclusive showing that the amounts contributed by Florida Power and Southern Bell are either unreasonable or made to inappropriate charities.

REGARDING POINT D:
Petitioner contends that in both orders the Commission departed from essential requirements of law by allowing both companies involved herein to retain those past charges deemed excessive rather than making said reduction orders retroactive. Petitioner points out that the test period adopted by the Commission in each proceeding to determine the justness and reasonableness of the rates and charges of each company covered the period of October 1, 1963 through September 30, 1964. In each order (No. 4076 and No. 4078) the Commission found these rates and charges unreasonably high and ordered reduction on an annual basis in the amounts of $3,741,885 and $7,073,000, respectively. Petitioner further points out that these rate reductions were made effective at dates subsequent to October 26, 1966, and November 2, 1966, respectively. It is Petitioner's contention that said rate reductions should be made retroactive to October 1, 1963 with appropriate refunds to the rate-payers. We do not agree with the petitioner's contention on this point. An examination of pertinent statutes leads us to conclude that the Commission would have no authority to make retroactive ratemaking orders. F.S. Section 364.14, F.S.A., specifically provides, in part:
"* * * the commissioners shall determine the just and reasonable rates, charges, tolls or rentals to be thereafter observed and in force * * *
"* * * the commissioners shall determine the just, reasonable, proper, adequate and efficient rules, regulations, practices, equipment, facilities and service to be thereafter installed, observed and used * * *" (Emphasis added.)
F.S. Sections 366.06(3) and 366.07, F.S.A., read in part:
"(3) Whenever the commission shall find, upon request made or upon its own motion, that the rates demanded, charged or collected by any public utility company for public utility service, or *260 that the rules, regulations or practices of any public utility company affecting such rates are unjust, unreasonable, unjustly discriminatory, or in any wise in violation of law, * * * or that such service is inadequate or cannot be obtained, the commission shall order and hold a public hearing, giving notice to the public and to the utility company, and shall thereafter determine just and reasonable rates to be thereafter charged for such service and to promulgate rules and regulations affecting equipment, facilities and service to be thereafter installed, furnished, and used; * * *" (Emphasis added.)
"366.07 Rates; adjustment.  Whenever the commission, after public hearing either upon its own motion or upon complaint, shall find the rates, rentals, charges or classifications, or any of them, proposed, demanded, observed, charged or collected by any public utility for any service, or in connection therewith, or the rules, regulations, measurements, practices or contracts, or any of them, relating thereto, are unjust, unreasonable, insufficient, or unjustly discriminatory or preferential, or in any wise in violation of law or any service is inadequate or cannot be obtained, the commission shall determine and by order fix the fair and reasonable rates, rentals, charges or classifications, and reasonable rules, regulations, measurements, practices, contracts or service, to be imposed, observed, furnished or followed in the future." (Emphasis added.)
Our decision on this point is supported by an opinion of the Supreme Court of the United States presenting the same question and involving an Ohio statute having basically the same language as the Florida statutes. In the case of Public Utilities Commission of Ohio v. United Fuel Gas. Co., 317 U.S. 456, 63 S.Ct. 369, 87 L.Ed. 396, the Court said:
"* * * The Commission's authority to inquire into the reasonableness of the rates charged by United for gas sold to the Portsmouth Gas Company is to be found in §§ 614-21 and 614-23, which provide as follows: `Upon complaint in writing, against any public utility, by any person, firm or corporation, or upon the initiative or complaint of the commission that any rate * * * is in any respect unjust [sic] unreasonable, unjustly discriminatory, or unjustly preferential or in violation of law, * * * the commission shall notify the public utility' and hold a hearing. If, after such hearing, the Commission finds that the rate or charge is unjust, unreasonable, or otherwise unlawful, it must `fix and determine the just and reasonable rate, fare, charge, toll, rental or service to be thereafter rendered, charged, demanded, exacted or collected for the performance or rendition of the service, and order the same substituted therefor.' § 614-23 (italics added). The statute in terms thus gives the Commission power to prescribe such rates prospectively only. If, after notice and hearing, the Commission finds rates to be unlawful, it can then fix the just and reasonable rates `to be thereafter' charged. The establishment of new rates must be preceded by a finding that the old rates are unjust and unreasonable, and the new rates are prospective as of the date they are fixed. There is no basis in the statute for concluding that the Commission's orders can be retroactive to the date when the Commission's inquiry into the rates was begun; on the contrary, the explicit language of the statute precludes such a construction." (Emphasis in original.) (At. 464, 63 S.Ct. at 374.)
Thus, in conclusion on this point, the statutes preclude such a retroactive order by the Commission.

IN REGARD POINT E:
Petitioner contends that the Commission erred in its determination as to what constituted a fair rate of return on invested capital of both companies. The *261 Commission found Southern Bell entitled to a fair rate of return of 6.80% and Florida Power & Light entitled to a 6.95% fair rate of return. Petitioner makes the assertion, but without convincing proofs in support, that both rates should be lower and contends that the methods utilized by the Commission to determine said rates constituted departure from essential requirements of law and is not supported by competent substantial evidence, but we find nothing in the record to substantiate Petitioner's assertion on this point. There is no showing in either case by Petitioner that withstands the "end result" test discussed earlier in this opinion.
Other points raised by the Petitioner relating to one and not the other utility have been considered also, including contentions that in the Southern Bell case the Commission: (1) improperly allowed all Western Electric profits from the sale of telephone equipment to Southern Bell to be included as part of Southern Bell's operating expenses in the determination of a fair return for it, notwithstanding both companies are owned by the American Telephone & Telegraph Company; (2) improperly accepted an arbitrarily fixed A.T. & T. dividend requirement of $4.00 per share on its common stock issued to obtain capital for Southern Bell in its determination of a fair return for the latter, and (3) in the Florida Power & Light Company rate case, arbitrarily and unlawfully denied the Petitioner the right to examine the books and records underlying the Company's exhibits.
The Commission found that the evidence did not show the prices paid by Southern Bell to Western Electric for telephone equipment were excessive but were in fact less than would have been paid other similar suppliers, or that Western's profits thereon were unreasonable. It found that telephone subscribers in Florida have substantially benefitted from the economies and efficiencies resulting from such sales between Southern Bell and Western Electric. Consequently, the Commission did not agree that the fact Western Electric and Southern Bell were subsidiaries of A.T. & T. affected the return allowed Southern Bell.
The record reflects A.T. & T. has a policy of paying a $4.00 per share common stock dividend to maintain the position of its stock in the money markets; that A.T. & T. is the money raiser and financial overseer of the Bell System, of which Southern Bell is a unit. The Commission did not find A.T. & T.'s policy of maintaining the $4.00 dividend resulted in increasing the financing costs of Southern Bell and augmented the rates of its subscribers.
In answer to the complaint the Petitioner was not permitted to examine the books and records of the Florida Power & Light Company underlying its exhibits, the Commission states the Petitioner made no effort to comply with the Commission's production and discovery rules (Rule 310-2.88 and Rule 1.28) but attempted an "en masse" examination or "fishing expedition" into the Company's records. Except for the failures of the Petitioner as indicated, we deem it would have been proper for the Commission to have accorded the Petitioner the right to examine relevant books and records of the Company under reasonable conditions and safeguards. See 73 C.J.S. Public Utilities § 54, p. 1122.
We do not find error in the specific findings and determinations of the Commission concerning these three points. Such findings and determinations of the Commission are presumed to be valid and reasonable absent clear and convincing showings to the contrary. 43 Am.Jur. Public Utilities and Services § 186, pp. 695, 696.
In summary, our principal holding in these cases is that from our study of the record evidence we find we should not disturb the two orders of the Commission because a test of the orders by the "end result" rule discloses the Commission's use of the end-of-the-year method in ascertaining *262 the rate bases of the two utilities considered in relation to the maximum percentages allowed on such bases for fair returns on investments to the utilities does not produce rates confiscatory to the utilities or excessive or exorbitant to their consumers or patrons. However, our ruling on this issue applies only to the instant cases and is not a binding precedent precluding the Commission from using the average investment during the test year method for rate base determinations in future rate cases. Moreover, the average investment method is expressly commended to the Commission as the better and sounder practice, except in abnormal and extraordinary situations and conditions where its use would clearly produce rates confiscatory to a utility.
Other contentions of Petitioner were specifically ruled upon and decided but also without binding the Commission to follow such rulings as precedents in future cases if to do so would be unreasonable or tend to produce rates confiscatory to a utility or excessive to its consumers or patrons.
Thus, for the reasons stated the writ of certiorari is discharged and Orders Nos. 4076 and 4078 of the Florida Public Service Commission should be and are hereby affirmed.
It is so ordered.
CALDWELL, C.J., and THOMAS, ROBERTS and THORNAL, JJ., concur.
NOTES
[1] The recent book OVERCHARGE by Metcalfe and Reinemer points out the need for adequate Commission staffs in properly determining electric power rates.