356 So.2d 254 (1978)
The CITIZENS OF the State of FLORIDA, Petitioner,
v.
Paula F. HAWKINS, Chairman, William T. Mayo, Commissioner, and William H. Bevis, Commissioner, As and Constituting the Florida Public Service Commission, et al., Respondents.
No. 51399.
Supreme Court of Florida.
February 16, 1978.
*255 Larry Levy, Public Counsel, and Peter A. Knocke, Associate Public Counsel, Tallahassee, for petitioner.
Prentice P. Pruitt, Legal Director, Donald R. Alexander, Staff Counsel, and Joseph A. McGlothlin, Staff Counsel, Tallahassee, for Florida Public Service Commission, respondent.
John Robert Jones, Columbus, Ohio, Hugh C. Macfarlane, Tampa, Wilton R. Miller, Tallahassee, James V. Carideo, Jr., and James F. Bell, Tampa, for General Telephone Co. of Florida, respondent.
ENGLAND, Justice.
Public counsel for the State of Florida asks us to review a rate increase awarded to General Telephone Company by the Florida Public Service Commission.[1] The only aspects of the Commission's decision which are challenged in this proceeding are the Commission's use of a year-end rate base, rather than an average year rate base, and the Commission's application of a so-called "subsidiary approach" to the computation of General Telephone's income tax expense for the test year, rather than a "consolidated approach".
In mid-1976, General Telephone sought a rate increase from the Commission of approximately $71,000,000, pursuant to Section 364.05, Florida Statutes (1975). Public counsel and several other interested parties intervened in the proceeding, and extensive public hearings were conducted in the area serviced by General Telephone. In due course the Commission's staff recommended approval of a rate increase aggregating approximately $46,000,000, after which the Commission, with the chairman dissenting, approved a rate increase of approximately $41,000,000.
Among other matters, the dissent criticized the use of a year-end rate base and the application of a subsidiary approach in calculating the company's income tax expense, estimating that a $5.8 million and $3.2 million saving, respectively, would accrue to ratepayers by use of an average rate base and a consolidated approach. In challenging the same rulings here, public counsel contends that the company's revenue increase should be reduced by nearly $13 million. General Telephone and the Commission, appearing in defense of the rate award, argue that the Commission's rulings on these two issues are consistent with established principles of law and accounting, and that they are properly supported by competent substantial evidence.

Year-End Rate Base
Public counsel's basic contention in this proceeding is that the allowance of a year-end rate base has been routinely permitted by the Commission since 1968, in contravention of our directive that this rate-making tool should be used only in "extraordinary" situations. City of Miami v. Florida Public Service Commission, 208 So.2d 249 (Fla. 1968). Public counsel has selected the allowance of a year-end rate base for General Telephone as typical of the Commission's consistent pattern in responding to utilities' requests for this "extraordinary" accounting procedure,[2] and has attempted to show *256 that the allowance in this case is unsubstantiated by any factual findings of extraordinary growth or circumstances. Both the Commission and General Telephone defend the allowance on a record that they contend supports findings of both attrition and plant expansion, two features they suggest justify use of a year-end rate base. They also challenge public counsel's basis for showing in this proceeding that the Commission has been guilty of approving rote year-end rate base awards. Our analysis of the respective arguments of the parties persuades us that public counsel's contentions are well-taken.
The test year or period is an analytical device used in rate-making proceedings to compute current levels of investment and income in order to determine the amount of revenue that will be required to assure the company a fair rate of return on its investment. Gulf Power Company v. Bevis, 289 So.2d 401 (Fla. 1974). In Gulf Power, we recognized that because "[r]ates are fixed for the future rather than for the past," test year data may be adjusted "in order properly to reflect typical conditions in the future period for which the rates [are] being fixed."[3] Use of a year-end rate base, rather than the more traditional average rate base, is one method by which the Commission adjusts any imbalance between the test-year data and the known future needs of the utility.
Rate base is the total amount which a utility has invested in capital items to provide its service. The ratio of the company's net income to its rate base provides its rate of return. Since the level of investment reflected on the company's books may vary during its test year period, the rate of return is susceptible of variations attributable to the choice of an average or a year-end rate base  the rate of return appearing to be lower when rate base at year end exceeds the yearly average.[4]
To offset the effects of intra-year rate base fluctuations, and to ensure that the figures employed in computing the rate of return accurately reflect a company's capital position, regulatory authorities have traditionally calculated the rate base as the average investment during the test year.[5] Since it rests on the assumption that, with minor adjustments for known changes, the relationship between investment and income during the test period will remain unchanged,[6] this method of computation provides a relatively dependable measure of predictability as to future conditions in times of market stability and orderly economic growth.[7]
It is apparent, however, that the average rate base approach can produce a distorted picture of future conditions when the company is experiencing extraordinary growth due to rapidly increasing demands for its services, as in periods of great population influx, or when other factors are forcing investment costs upward without a concomitant increment in revenues.[8] This latter phenomenon, commonly referred to as "attrition", is principally a by-product of inflation. To compensate for the problems of extraordinary growth and attrition, regulatory bodies have developed several methods of adjusting rate computations, one of which is to measure investment at the end *257 of the year, including property under construction, rather than taking the test period average.[9]
The year-end rate base was first utilized by the Commission in Florida in 1953. Re: Florida Power Corp., 99 P.U.R. 129 (1953). This Court approved its use in the City of Miami case. We carefully stressed, however, that the year-end rate base is to be regarded as a deviation from the norm, and that it should properly be employed only in the most exceptional of cases:
"We wish to make it clear that in not disturbing the use of the year-end method ... in fixing rates in these cases rather than average investment during the test year, we do so because of the strong unrebutted evidentiary showing that ... utilities are endeavoring to cope with extraordinary needs for their services due to abnormal population and economic growth conditions within their service areas.
... [I]t is our belief that in the absence of the most extraordinary or emergency conditions or situations, average investment during the test year should be the method employed by the Commission in determining rate base. Our study of the subject discloses that average investment during the year is the better choice of methods and we commend it to the Commission in future cases  and suggest it should not be departed from except in the most unusual and extraordinary situations where not to do so would result in rates so low as to be confiscatory to the utility."[10]
Notwithstanding our admonition, a review of the Commission's decisions indicates that, with one exception, a year-end rate base has been applied in every major electric and telephone utility case to come before it since 1968.[11]
General Telephone and the Commission argue that the combined effects of company growth (requiring plant expansion to meet increasing consumer demands) and attrition (due to increased operating costs brought on by inflation) necessitate the application of a year-end rate base for this, as well as other Florida utilities. As evidence of this need, they point to the fact that General Telephone has not earned its authorized rate of return at any time since 1973 and that, notwithstanding the consistent use of a year-end rate base, major utilities have been repeatedly forced to return to the Commission for rate relief during the past nine years. Distilled to its essence, respondents' position is that so long as Florida continues to experience high levels of population growth and inflation, the year-end rate base should properly be the rule rather than the exception in rate-making determinations.[12]
*258 We perceive in respondents' rationale for the year-end rate base a concern more for the effects of attrition than for evidence of extraordinary or unusual growth. For example, the Commission states, after concluding with little discussion that comparative statistics reflect extraordinary company growth:
"We also observe the basic proposition that the use of a year-end rate base may be necessary and appropriate notwithstanding the fact that growth in certain categories may not be unusual or extraordinary... . The three types of attrition affect public utilities and occur whenever inflation is present irrespective of the growth rate that may be experienced... . There are, then, clear and compelling circumstances when a mismatch between investment and revenues is required even though extraordinary growth rates may not exist... . [T]he record discloses that ... attrition [has] had a pervasive effect on the Company and the use of a year-end rate base is clearly required ... and our decision shall rest upon the application of the same."
In holding that the use of a year-end rate base may be justified in the absence of extraordinary growth, the Commission clearly departed from the rationale of our decision in the City of Miami case.
Our review of the record indicates that the Commission's concern for the erosive effect of attrition on the company's ability to earn its fair rate of return is indeed well-founded. We do not, however, conclude from that fact alone, as the Commission did, that a year-end rate base "is the most practical way by which to alleviate the problem." Rather, we hold that a separate attrition allowance is the appropriate tool. For one thing, attrition is more easily quantifiable than growth. An example is this case, where the Commission awarded General Telephone a separate attrition allowance for increased plant expansion, in the form of a rate base increase of approximately $20,600,000.[13] For another, we ensure a more workable basis on which to review a rate award if we require independent determinations of growth and of attrition. By this means we avoid the dual difficulties encountered here of guessing what record evidence of attrition supports the year-end rate base and whether the Commission would have used that base if attrition had been isolated from growth. In future rate cases, and on remand here, these uncertainties will be eliminated by having the Commission predicate its decision regarding the use of a year-end rate base solely on considerations of extraordinary growth, and by requiring all adjustments for attrition to be encompassed within a separate allowance.

Income Tax Effect
General Telephone is a wholly-owned subsidiary of General Telephone & Electronics (GTE), a nationwide conglomerate of utility and other diversified corporations. General Telephone has filed a consolidated federal income tax return with GTE. In computing the amount of federal income tax expense to be considered in determining General Telephone's net operating revenue for the test year, the Commission was unable to ascertain from the company's books a particular dollar amount for these taxes  there is no such figure because income taxes are paid by the parent and allocated by accounting entries among GTE's various subsidiaries. In the absence of a specific dollar figure available from the books of General Telephone, the Commission applied *259 its traditional "subsidiary approach" and computed an allowance for federal income tax expense equal to the hypothetical tax which would have been paid if General Telephone had filed a separate federal income tax return.
The effect of this computation, according to public counsel, is to treat the capital structure of General Telephone as consisting entirely of equity held by GTE, ignoring the fact that GTE's capital structure is an admixture of debt and equity. Public counsel contends that this is misleading, resulting in overcharges to General Telephone's ratepayers, because the actual dollars paid in federal income tax on behalf of General Telephone are computed from a debt-equity mix in the capital structure of GTE.[14] He asserts that a failure to recognize the parent's debt-equity mix in the computation of tax effect produces "double leverage", permitting General Telephone to receive an allowance for income tax expense greater than the actual income tax liability for which it is properly responsible under GTE's consolidated return. The dollar difference between actual tax payments on General Telephone's behalf by GTE and the hypothetical tax for which the ratepayers will be charged is alleged to be $4,755,560.
Both the Commission and General Telephone defend the subsidiary method of calculating tax effect on the ground that the choice of proper accounting treatment is discretionary with the Commission. They maintain that public counsel may not rely on the Commission's recent order directing Southern Bell Telephone and Telegraph to compute tax effect based on a consolidated approach, since in that case Southern Bell also consolidated its capital structure for rate base computations.[15] They further assert that the Commission's action here is consistent with Southern Bell because in this case the Commission has approved a subsidiary approach for the rate base computation, as it did for the tax effect, and the former was approved without public counsel's objection. Respondents do not, however, suggest why a subsidiary approach should not be used for one purpose and a consolidated approach for the other, and the only reasoning offered to support parallel treatment is a declaration of the need for consistency which appears in specially concurring opinions authored by the prevailing commissioners.[16]
After weighing the arguments presented and attempting to discern a rationale for a rule of consistency, we are unable to conclude with the majority of the Commissioners that the use of the subsidiary approach for determining cost of capital automatically dictates the use of the same approach for tax effect calculations. Each determination must be based on specific independent findings supported by competent substantial evidence. See Section 120.59(1), Florida Statutes (1975); International Minerals and Chemical Corp. v. Mayo, 336 So.2d 548, 552-53 (Fla. 1976). There was no such independent finding in this case, and what evidence there is in the record[17] supports the consolidated *260 approach as being more accurate.[18] Accordingly, we are compelled to reverse the Commission on this issue. Section 120.68(10), Florida Statutes (1975).
For the reasons expressed, we remand this case to the Commission to adjust General Telephone's rate award by application of the consolidated approach to the computation of federal income tax expense, and to reconsider the use of a year-end rate base for General Telephone in light of the principles enunciated.[19]
It is so ordered.
ADKINS, Acting C.J., BOYD, HATCHETT and KARL, JJ., concur.
NOTES
[1] Re: Petition of General Tel. Co. of Florida, Order No. 7669, Docket No. 760464-TP (CR) (Fla.Pub.Serv.Comm'n 1977). The office of public counsel was created by Chapter 74-195, Laws of Florida, now codified in Sections 350.061-.0614, Florida Statutes (1975). Having been granted the right to intervene in General Telephone's rate application proceeding, public counsel is authorized to seek a review of the Commission's final decision in this Court. Art. V, § 3(b)(3), Fla. Const.; §§ 350.0611(3) and 366.10, Fla. Stat. (1975); § 120.68(1), Fla. Stat. (1975).
[2] Public counsel notes that, although the Commission used an average rate base in one case which came before it shortly after the City of Miami decision, the year-end rate base has otherwise been uniformly applied in over thirty major electric and telephone utility cases decided by the Commission since 1968.
[3] 289 So.2d at 404. The usual form of adjustment, and the type approved in Gulf Power, is an allowance for items which can be classified as "known changes which will occur within a reasonable time after the end of said period". 289 So.2d at 404.
[4] See generally Jones, Judicial Determination of Public Utility Rates: A Critique, 54 B.U.L. Rev. 873 (1974).
[5] In its brief, the Commission explains that the two most commonly used methods of computing average rate base are "to add the ending balances for the 12 months comprising the test period plus the preceding month and divide by thirteen, or to take the beginning and ending balances and divide by two."
[6] See United Tel. Co. v. Mayo, 345 So.2d 648, 650 n. 1 (Fla. 1977).
[7] See, e.g., Re: Florida Power Corp., 99 P.U.R. 129, 134 (1953).
[8] Id.
[9] Other methods include a separate attrition allowance added to the rate base, as was also done by the Commission in this case, and an upward adjustment in the allowable rate of return. For a discussion of these and other methods, see C. Phillips, The Economics of Regulation 243-44 (rev.ed. 1969).
[10] City of Miami v. Florida Pub. Serv. Comm'n, 208 So.2d 249, 258 (Fla. 1968).
[11] See Appendix to petitioners' main brief. The Commission's use of a year-end rate base has been challenged in only two cases since 1968. In Shevin v. Yarborough, 274 So.2d 505, 511 (Fla. 1973), we upheld the Commission's determination that, because Florida Power & Light was "the fastest growing electric utility in the United States," it would be "completely unrealistic ... to say that a year-end rate base is not valid and proper." In Citizens of Florida v. Mayo, 335 So.2d 809 (Fla. 1976), a concurring opinion responded to public counsel's contention that the use of a year-end rate base constituted an exercise of discretion in excess of the Commission's lawful authority by stating that public counsel had "failed in his burden of demonstrating that the Commission acted unreasonably under the circumstances of the ... request for interim relief." 335 So.2d at 810 (Sundberg, J., concurring).
[12] Commissioner Mayo obviously recognizes that year-end rate base has already become the rule. In his concurring opinion he states:

"The use of a year end rate base is consistent with the approach that has been followed by this Commission in cases such as this for 24 years... . [T]he use of an average rate base would represent a clear departure from the principles which we have adhered to over the years."
[13] General Telephone had requested two special allowances for plant expansion attrition, one based on proposed capital investments for the 12-month period following the test year and another based on construction projects placed in service within 90 days after the end of the test year. Following the strict requirement for out-of-period adjustments which is discussed in note 3 above, namely that they must reflect "known" changes, the Commission rejected the first requested allowance. The Commission accepted a dollar allowance for known additions to plant within 90 days of the end of the test year, which the Commission could verify and which it had used in other telephone proceedings. It rejected the "proposed" capital investment allowance, among other reasons, as both speculative and incapable of audit verification.
[14] Interest on debt is deductible for federal income tax purposes, while dividends on stock are not. Public counsel argues that tax computations which disregard debt, as in the subsidiary approach, understate deductions actually taken in computing the tax dollars which are ultimately paid by GTE and then allocated by bookkeeping entries to General Telephone (and to other subsidiaries).
[15] Re: Southern Bell Telephone & Telegraph Co., Order No. 7018, Docket No. 74805-TP, 12 P.U.R.4th 252, 262 (Fla.Pub.Serv.Comm'n 1975).
[16] In one concurring opinion, Commissioner Mayo states that because the order "specifically rejected the use of GTE's consolidated capital structure for determining General's rate of return costs, ... consistency dictates that the tax effect of the parent company debt not be used in this proceeding." In the other, Commissioner Bevis concludes that "[s]ince we have rejected the use of a consolidated capital structure in this case, it simply would be inappropriate to take into consideration the tax effect of the parent company debt."
[17] In its rate award order, the Commission nowhere identified a record basis for preferring the hypothetical computation of tax on the subsidiary approach over a calculation on the consolidated approach. Only one witness testified as to which would more accurately reflect actual tax payments made by GTE, and his testimony was unrebutted. All discussion in the Commission's rate award order concerning this witness' testimony is directed at his treatment of the double leverage effect of General Telephone's consolidation on the company's capital structure for rate of return purposes.
[18] Actualities, which in this case would reflect actual federal tax payments, are always to be preferred over hypotheticals such as the subsidiary approach procedures. See Re The New York Telephone Co., 7 P.U.R.4th 496, 506 (Conn.P.U.C. 1974); Re The Seymour Water Co., 97 P.U.R.3d 315, 318 (Conn.P.U.C. 1972):

"[W]hile the stockholder of the applicant company is entitled to a fair rate of return, ... [the utility] may not earn in excess of a fair rate of return by claiming a tax charge that is larger than the actual liability therefor."
The Commission recognized a preference for actualities in rejecting the company's proposed allowance for estimated capital investment. See note 13 above. While noting General Telephone's poor track record for estimating projected main station growth, the Commission observed the different effect which projections might have as compared with "actual" station gains.
[19] This rate base issue is intertwined with the Commission's selection of nationwide, as opposed to intra-state, growth statistics. Public counsel and the dissenting commissioner reflect less growth for General Telephone by using comparative figures from independent telephone companies in Florida. We decline to enter into this dispute. The appropriate bases for comparative growth, both in terms of external referents and choice of account items to be compared, are properly determined by the Commission in the exercise of its rate-making discretion.