### Petition of GENERAL TELEPHONE CO. OF FLORIDA.
Docket No. 760464-TP(CR). Order No. 8331.

Florida Public Service Commission.

June 2, 1978.

Hugh C. Macfarlane, Tampa, for the petitioner.

Jack Shreve, Public Counsel, Tallahassee.

George B. Stallings, Jacksonville, for the Florida Retail Federation.

Felix A. Johnson, Jr., Tallahassee, for the Florida Association of Telephone Answering Services.

Walter H. Alford, General Solicitor,, Southern Bell Tel. & Tel. Co., Miami.

Leo Foster, Tallahassee, for Florida Hotel & Motel Association.

The following commissioners participated in the disposition of tihs matter — PAULA F. HAWKINS, Chairman, and Commissioners WILLIAM T. MAYO and ROBERT T. MANN.

BY THE COMMISSION.

*Order requiring rate reduction:* This proceeding is on remand from the Supreme Court of Florida as a result of that court's decision in *The Citizens of the State of Florida v. Hawkins,* 356 So.2d 254 (Fla. 1978). By way of background, General Telephone Company filed a petition and new rate schedules on June 18, 1976 wherein it sought $71,056,548 in additional annual gross revenues. Ultimately the commission authorized the company to increase its rates and charges by $40,921,000 (Order No. 7669, 3/7/77). That level of revenues was predicated in part upon (1) the use of a year-end rate base, and (2) the computation of income tax expense by using the interest expense related to long term debt of General of Florida. A petition for writ of certiorari was filed by public counsel, an intervener in this proceeding, seeking review of Order No. 7669 and specifically our procedures in calculating the investment (rate base) and income tax expense of General. In remanding the proceeding back to the commission the court directed us to "adjust General Telephone's rate award by application of the consolidated approach to the computation of federal income tax expense, and to reconsider the use of a year-end rate base for General Telephone in light of the principles enunciated." 356 So.2d 254, 260. The purpose of this order is to comply with the court's mandate.

Our decision herein shall be confined to the two issues presented to the court. First, we shall reconsider the use of a year-end rate in light of the principles enunciated by the court. We perceive those principles to be (1) that "a year-end rate base is to be regarded as a deviation from the norm, and that it should properly be employed only in the most exceptional of cases," and (2) our "decision regarding the use of a year-end rate base . . ." shall be ". . . solely on considerations of extraordinary growth." Stated differently, in the absence of extraordinary growth, the use of an average rate base should be our preference in determining the investment to be used in developing the revenue requirements of a public utility. Accordingly, we have again examined with considerable care the evidence

adduced by the company in support of its year-end investment. That evidence (Exhibit No. 7) reflects that while General's growth in a number of categories exceeds that of other telephone utilities as a whole on a nationwide basis, it nevertheless cannot be considered to be of such magnitude as to be characterized as extraordinary. Further, we do not find the evidence presented on this issue is sufficient to warrant "a deviation from the norm." Neither does it support a finding that we have before us an "exceptional" case as contemplated by the court. Consequently, we must conclude and so find that an average rate base is required and that General's revenue requirements should be reduced by $8,064,500, the derivation of which is set out hereinafter.

### AVERAGE RATE BASE
#### General Telephone Company of Florida

| | |
|---|---:|
| Intrastate year-end rate base | $806,137,637 |
| Intrastate average rate base | 763,634,160 |
| | |
| Rate base effect | 42,503,477 |
| NOI effect 9.31% | $ 3,957,074 |
| Expansion factor | ÷.490678 |
| Revenue effect (reduction) | $ 8,064,500 |

Next, we must "adjust General Telephone's rate award by application of the consolidated approach to the computation of federal income tax expenses." This is merely a mechanical adjustment and requires that the prorated portion of interest cost related to long term debt of General Telephone and Electronics consolidated system be used in calculating income tax expense. By performing the calculation of income tax expense in this manner, it results in reducing revenue requirements by $1,908,000. The derivation of this amount is shown hereinafter.

### TAX EFFECT OF CONSOLIDATED SYSTEM DEBT
#### General Telephone Company of Florida

| | |
|---|---:|
| Average capital structure (intrastate) | $681,795,000 |
| Embedded cost of system debt | 28,414,000 |
| General of Florida's interest | 26,530,000 |
| | |
| Increase in interest | 1,884,000 |
| Tax effect | x .506 |
| | |
| NOI increase | $ 953,000 |
| Expansion factor | ÷ .4995 |
| | |
| Revenue reduction | $ 1,908,000 |

The two adjustments collectively total $9,972,500 and reduce total revenue requirements of General from $40,921,000 to $30,948,500. We have made no further adjustments upon remand since, in our judgment, none are required. The parties herein (General and the public counsel) have filed briefs on the pertinent issues and have presented oral argument in support of their respective positions. While each has suggested an appropriate attrition allowance to be used in this proceeding, and the manner in which such allowance should be calculated, we find resolution of these issues unnecessary and have confined our decision to the two issues specifically presented to the court. Further, we have already provided a separate attrition allowance to the company, with the court's approval, which increases investment by an amount equal to ninety days of net plant added during the period April 1, 1976 through June 30, 1976.

Because a rate reduction is being effectuated, it is necessary to implement that reduction through a revision of the tariff sheets of the company. The simplest and most equitable manner in which to allocate this reduction is by reducing the basic monthly local exchange rates. This results in the following new charges —

| Rate Group | Business | | | Residence | | | |
|---|---|---|---|---|---|---|---|
| | 1-Pty. | 2-Pty. | Measured | 1-Pty. | 2-Pty. | 4-Pty. | Measured |
| I | $24.00 | $20.40 | N/A | $ 9.40 | $ 7.60 | $ 6.65 | $ 5.65 |
| II | 25.15 | 21.35 | N/A | 9.90 | 8.00 | 6.95 | 5.95 |
| III | 26.35 | 22.40 | N/A | 10.35 | 8.35 | 7.20 | 6.20 |
| IV | 27.50 | N/A | 16.50 | 10.80 | 8.70 | 7.10 | 6.50 |
| V | 28.70 | N/A | 17.20 | 11.25 | 9.10 | 7.75 | 6.75 |
| VI | 29.90 | N/A | 17.90 | 11.75 | 9.50 | 8.05 | 7.05 |
| VII | 31.15 | N/A | 18.70 | 12.20 | 9.95 | 8.30 | 7.30 |

These changes are applicable to all local exchange service rendered by the company since March 11, 1977. Because the company has been charging the higher rates during the pendency of the appeal, and all increases have been collected subject to refund by virtue of a stipulation entered into by the company and public counsel on June 27, 1977 and approved by the court on June 28, 1977, it is necessary that appropriate refunds be made to those customers who received bills for telephone service between March 11, 1977 and the date on which the new rates become effective. The full refund does not include, however, customers who left the system owing moneys to the company for which the deposit was insufficient to cover the final bill. In those cases the refund shall be applied to the unpaid balance and any remainder shall be refunded to the customer.

In determining the excess billing during the period in question, we are requiring the company to recalculate all customers' bills using both the rate schedules approved herein and the rates in effect during the pendency of the appeal. We are also requiring the company to properly apply any applicable fees and taxes on each of the bills and crediting the difference to each customer's refund. The sum of these two items (excess base rates plus excess fees and taxes) will represent the refund to the customers and will be reflected as a credit on each existing customer's bill. For those customers who have left the system and are entitled to a refund, we are requiring the company to mail refund checks to the last mailing address of record. However, the company shall not be required to mail refund checks in the amount of less than $1. Customers may claim amounts less than $1 by making a request to the company for said refund. A special checking account should be used for one year for the express purpose of issuing refund checks. In the event checks are returned because of no forwarding address, the refund will revert back to the special checking account for the remainder of the year. Any money remaining in the account after one year should then be placed in the company's general operating account and so marked, and the checking account then closed. As provided for by law, any refund moneys not claimed within seven years shall escheat to the state.

The refund procedure should commence no later than 90 days from date of this order. We view a five to six week time period as a reasonable time in which to complete the refund process. At the conclusion of the process, the company shall promptly submit to the commission the following information — (1) number of existing accounts which received a credit, (2) number of off-line accounts receiving a check, (3) the amount of money refunded, which shall be broken down in the following manner: base rate, applicable fees and taxes, and (4) the number of accounts which did not receive a refund due to uncollectibles, dollars applied to said uncollectibles and number of accounts and dollar amounts on which less than $1 is owed. Further, we shall require a monthly report indicating the number of checks returned, the reason for such return and the amount thereof. A final report should be submitted at the end of each year summarizing the refund and indicating the amount of money not refunded.

It is therefore ordered that General Telephone Company of Florida is hereby directed to reduce its rates and charges by .$9,972,500 on an annual basis.

It is further ordered that the company file appropriate tariff revisions consistent with the main body of this order to be effective on all bills rendered on and after June 12, 1978.

It is further ordered that the company shall refund to its customers those revenues collected between March 11, 1977 and the date on which the new rates become effective which exceed that being authorized herein.

It is further ordered that the company give appropriate notice to each customer concurrently with the bill which first reflects the rate reductions directed herein explaining the nature, purpose and effect of the rate reduction, and the refund required herein. Said notice shall be submitted to this commission for our approval prior to the mailing of same to its customers.

Commissioner MAYO specially concurs as follows —

Several procedures have been used by regulatory commissions to try to cope with the unbroken spiral of price inflation and the rapid erosion of the value of the dollar which has come to pass in the last ten to twelve years. Inflation is an economic fact of life from which neither the general body of ratepayers nor public utilities have been able to escape. The result of this rapid inflation has been the erosion of an *economic entity's* achieved rate of return, i.e., attrition.

The Supreme Court has found that the commission should predicate its decision regarding the use of year end rate base solely on consideration of extraordinary growth, and by requiring all adjustments for attrition to be encompassed within a separate allowance. However, the court failed to define or identify any method for dealing with the problem of adequately and correctly measuring attrition. It merely said to use a separate attrition allowance to cope with the problem.

Methods which have been utilized by this commission to compensate for the erosion of a company's achieved rate of return have been — 1) year end rate base, 2) ninety days of net telephone plant, and 3) known and imminent changes. These types of tools are quantifiable and can be confirmed through audit procedures of the company's financial records; they are not subjective. The goal or objective of any attrition allowance is to compensate for the erosion of a firm's earnings. These three tools comply with this objective and can be measured with a high degree of validity.

All allowances for erosion of earnings must compensate for the expected future attrition rate. The error of computing attrition, in the manner used by the public counsel, is that it is based only on the historical decline in the company's rate of return. This computation did not consider the underlying causes of past attrition and their probable effect upon future trends. A multitude of variables affect a telephone utility's attrition rate. For any given time frame, some of these are (1) changes in level of service, (2) changes in type and amount of plant in service, (3) sufficiency of plant capacity and (4) varying demands for service. The public counsel's com-

puted attrition rate of .80% *did not* consider these underlying causes and their probable affect upon future trends.

I do feel that in future cases, attrition allowances similar to the one presented by public counsel should be computed and considered. It should not be used in lieu of the three tools described previously, but instead should be used in parallel with these tools as additive support and verification of a firm's past and expected future attrition.

Chairman HAWKINS specially concurs as follows —

The issuance of this order marks a great day for Florida's ratepayers.

In virtually every decision granting a rate increase that has been issued by this commission since I was first elected, I have been forced to dissent from the decision of the majority. One ground for my dissents has been the continued insistence of the majority to ignore the clear mandates of the Florida Supreme Court regarding the use of the year-end rate base.

The year-end rate base is an accounting gimmick, the use of which ultimately means higher rates for the ratepayers. Under certain limited circumstances, as defined by the Florida Supreme Court, the use of a year-end rate base is required. But in most of the cases I have been called upon to vote on, the use of the year-end rate base was clearly inconsistent with the Supreme Court's dictates. Nevertheless, the year-end rate base was approved by the majority, with only one exception, in every case decided by this commission since 1968. Each such decision has meant a rate increase millions of dollars higher than it otherwise would have been.

The Supreme Court's decision in this case upholds the position I have consistently voiced in my dissents and should mean an end to the continued "rubber stamp" use of the year-end rate base.

In its language suggesting the utilization of a separate "attrition allowance," however, I fear the court's decision may create future problems.

Attrition, or the erosion of a company's profits over time is not easily predicted. In fact, it is virtually impossible to predict not just the rate or amount of attrition that might occur in the future, but even whether attrition will occur at all. For that reason, I share Commissioner Mayo's concern over the use of an attrition adjustment like that proposed by the public counsel. The factors that cause attrition are many. Some causes of attrition are not easily manipulated or controlled by the utility, for example, inflation. But corporate inefficiency, overspending, and many other factors strictly within management control can also cause attrition.

It is my opinion, therefore, that a separate attrition adjustment in the absence of compelling evidence to the contrary is unwarranted. Rather, when because of attrition a company's profits erode to a level management feels is unacceptable, the company can file a rate increase request. Our continued use of a historical test year, coupled with a thorough and comprehensive examination of every facet of a company's operations during the process of a rate case, is the best protection for ratepayers and for utilities.

In times of high inflation, rate cases may come much more frequently than we would like, but frequent rate cases are, I believe, less undesirable than granting huge rate increases based on speculative information.