289 So.2d 401 (1974)
GULF POWER COMPANY, a Corporation, Petitioner,
v.
William H. BEVIS et al., Respondents.
No. 43245.
Supreme Court of Florida.
January 30, 1974.
*402 Bert Lane of Beggs, Lane, Daniel, Gaines & Davis, Pensacola, for petitioner.
Reubin O'D. Askew, Governor of Fla., and Arthur J. England, Jr., Consumer Advisor and Sp. Counsel to the Governor, and Robert L. Shevin, Atty. Gen., and W. Robert Olive, Jr., Asst. Atty. Gen., for cross-petitioners.
Donald R. Alexander, Tallahassee, for respondents.
Robert R. Feagin III of Holland & Knight, Lakeland, for amicus curiae, Tampa Electric Co.
B. Kenneth Gatlin and Jack M. Skelding, Jr. of Madigan, Parker, Gatlin, Truett & Swedmark, Tallahassee, and Frank H. Bass, Jr., St. Petersburg, for amicus curiae, Fla. Power Corp.
Edwin L. Mason, of Mason & Erwin, Tallahassee, for amicus curiae, St. Joseph Telephone and Telegraph Co., and Gulf Telephone Co.
*403 DEKLE, Justice.
This is a review in certiorari of orders of the Florida Public Service Commission. The first order, entered June 30, 1972, authorized an increase in petitioner's rates in order to allow a fair rate of return upon its properties and investment which is constitutionally required.[1]
Thereafter, the Governor of the State of Florida and the Attorney General of Florida (who had not previously been parties in the proceeding) filed extraordinary petitions for reconsideration directed to that portion of the Commission's order which took into consideration in determining a fair rate of return, the additional expense required to be paid by the utility under the new state corporate income tax. This was treated by the Commission in its ultimate determination in that original order as one of the many factors requiring consideration in arriving at an overall result of a fair return fixed in its order at the "midlevel" of 8.06%. The amount of the tax was not applied on the basis of a direct, independent addition to the rate to be charged but was properly considered along with other expenses of the utility in determining a proper return as required by law.
The Commission found the corporate income tax to be one which "will have a pronounced and material effect on the earnings of the Company," pointing out in its order that for the test period "the Company would have incurred a $756,499 expense for this tax alone." The Commission in its order then pointed out that "we would be remiss in our duty if we failed to recognize that Gulf's earnings will be materially reduced by this tax;" and further stated, "The state income tax will of course also decrease the Company's net operating income to some extent." Thus it is seen that the Commission correctly perceived the effect of the new state income tax as an additional expense of doing business which naturally reduces the income of the company and which must accordingly be considered in focus as one of the factors in arriving at a fair rate of return, which they correctly did.
The respondents, and the Governor's counsel in particular, argue that this disposition of the corporate income tax in the determination of rates was not an issue before the Commission and was not one determined by it for our review. The record is to the contrary. The Governor's extraordinary petition itself urged the Commission to reverse this very determination and made it the prime issue when it stated:
"The determination of the Commission in this case that Florida corporate income tax liability is an operating expense properly chargeable in full to utility customers is the first determination by the Commission on this precise question, and for that reason has extraordinary policy implications for all future rate cases."
The Governor's petition then expressly sets forth as his number one objection to the Commission's initial order that:
"(1) the order sets precedent for the basis upon which the tax pass-on is computed... ."
It is accordingly clear that this very issue was the basis for the new order under attack here upon certiorari review and must be resolved by us. Such resolution will in turn dispose of the procedural questions raised.
The issue regarding disposition of the state corporate income tax in the fixing of rates by the Commission is pinpointed in *404 its new order under review, rejecting any allowance for such tax, despite the fact that the Commission expressly recognizes still the impact of the tax upon the operating income of the company and therefore the diminishing of its opportunity for a fair rate of return upon the utility's investment. The Commission's specific findings in this respect have not been changed and remain in effect. The Commission took into account such findings when it first fixed the rates in arriving at the correct fair return of 8.06%.
It is not a question of any particular item of expense being given isolated consideration, as respondents seem concerned that it is; rather it is a consideration of all pertinent expenses and income in determining the ultimate question, namely, that of a proper rate which affords a fair return. This the Commission correctly did in the first instance and should not have receded from it. The already effective tax was an essential "out of period adjustment" necessarily considered as supplemental to the test year being applied. The authorities unanimously require this.
Rates are fixed for the future rather than for the past and for this reason a pre-fixed earlier period cannot be arbitrarily applied, as the Commission has now done at the urging of the Governor and Attorney General. A rate making body such as Florida's PSC cannot ignore an existing fact that admittedly will affect the future rates, such as the corporate tax here. This question has been settled by the U.S. Supreme Court in McCardle v. Indianapolis Water Co., 272 U.S. 400, 47 S.Ct. 144, 71 L.Ed. 316 (1926). There, the U.S. Supreme Court said that the fixing of utility rates must of necessity be related to matters which are reasonably predictable as being involved, for the process is one of making a rule for the future. This is really the principle which the Commission correctly applied when it entered its original order and said:
"In regulatory rate making, it is customary to select a test year or period for the purpose of testing the revenue requirements of the utility under consideration. The judicial decisions on the subject of the appropriate test year in a utility rate case uniformly adhere to the rule that the test period should be based on the utility's most recent actual experience with such adjustments as will make the test period reflect typical conditions in the immediate future. The propriety or impropriety of a test year depends upon how well it accomplishes the objective of determining a fair rate of return in the future. Thus, the realistic approach to this issue, since rates are fixed for the future and not for the past, is to use the most recently available data for a 12-months' period, adjusted for known changes which will occur with in a reasonable time after the end of said period so as to fairly represent the future period for which the rates are being fixed." (Emphasis added)
The Commission thereby correctly recognized and considered initially the corporate income tax since it became effective before the hearings were even completed and before its order was entered. It could not be ignored. The test year data were accordingly adjusted to recognize and to take into account a known change in order properly to reflect typical conditions in the future period for which the rates were being fixed. That is what the "test period" is  a sample or typical example, to determine a future course.
The law is a tool of justice, not a goddess to be worshiped. When the Commission later took the position that test-period adjustments must recognize only those changes which take place precisely within ninety days after the end of the test year, it lost sight of this basic objective of the "tool" it was using as a "test period" to arrive at a fair, "typical" result. For it is a correct result which is the goal of the determination and not merely the means or formula used in arriving at the answer. The blind application of such a time limitation is grossly arbitrary *405 and completely ignores the purpose of the rule and the basic reason for test-year adjustments. These are used simply because it is unwieldy and cumbersome to try to apply a total and unending time.
In Letourneau v. Citizens Utilities Company, 128 Vt. 129, 259 A.2d 21, 24 (1969), the Vermont Supreme Court defined the purpose of the test year in public utility rate making when it said:
"The propriety or impropriety of a test year depends upon how well it accomplishes the objective of determining a fair rate of return in the future. It must reasonably represent expected future operations. ..." (Emphasis added)
Innumerable other authorities have held to the same effect.[2]
In the cause before us, when the Commission entered its second order here under review, the corporate tax under discussion had in fact been in effect for almost a full year. To ignore this fact was error in the new order; refusal to recognize the existing tax would present a false picture of the utility's future earnings and rate of return.
Recently the Massachusetts Supreme Judicial Court had occasion to consider a situation closely resembling the one before us today. In New England Tel. & Tel. Co. v. Dept. of Pub. Util., 275 N.E.2d 493 (Mass. 1971), a telephone company appealed a decision of the state regulatory agency, contending that, in computing the company's expenses for the test year, the agency had committed error in that it improperly failed to include certain federal and municipal taxes. Specifically referring to the disallowance of the Social Security taxes, the Court said:
"There was undisputed evidence that the rate of the Social Security taxes payable by the Company would increase from the 4.8% in effect in 1969 to 5.2% on January 1, 1971. The Company estimates that the effect of this change will be to increase its Social Security taxes by the amount of $380,000 a year. The Department appears to have made no allowance for this in its test year computations. This increase was foreseeable at the time of the Department's decision, and was to take effect slightly more than six months after the decision. On remand the Department shall determine and consider the amount of such increase in its test year computations." (Emphasis added)
The recognized rule then is that the test year must be adjusted for known and imminent changes in order to be representative of the conditions which will prevail in the immediate future when the rates will become effective. Inapplicable factors must be removed from test-year considerations, while appropriate new ones must be added. In Central Maine Power Co. v. Public Util. Comm., 153 Me. 228, 136 A.2d 726, the Supreme Judicial Court of Maine concluded that in determining test-year data, facts which have no future validity must be discarded, while facts which with certainty will gain future validity must be considered by the Commission even though they do not affect test-year operations.
The former corporate privilege tax in Florida was customarily allowed in rate cases by the Commission as an operating expense. This has been replaced by the state income tax. Accordingly, the corporate privilege tax no longer had future validity and it was therefore properly removed from test-year data. By the same token, the new corporate income tax had achieved validity six months prior to the Commission's original decision. Its impact on Gulf Power's future earnings was definitely known and was properly recognized *406 by the Commission when it issued its original order. It had been in effect for one year when its recovery was disallowed by the Commission on reconsideration.
Disallowance of the corporate tax was a clear departure from the essential requirements of law, demanding issuance of the writ of certiorari. The Commission's original treatment of this tax as a proper out-of-period adjustment to test-year data was eminently correct and should not have been changed on reconsideration, especially since the Commission did not recede from its original position that the tax constitutes a cost of doing business which the utility was entitled to recover through its rates and charges.
The voluminous authorities on this question, including those we have cited, make it quite obvious why the Commission originally allowed this tax as a cost of doing business and, therefore, properly to be considered by the utility in the determination of its rates and charges. It is equally clear why the Commission, on reconsideration, did not change its position that this tax in fact does constitute a cost of doing business as to utilities and must be taken into consideration in fixing a utility's rates.
The decided cases leave no room for doubt in this regard and the result is inescapable. The United States Supreme Court in 1922 set a precedent which has been followed to this date. The landmark decision of Galveston Electric Co. v. Galveston, 258 U.S. 388, 42 S.Ct. 351, 66 L.Ed. 678 (1922), held that all expenses and charges, including all taxes, must be deducted from a utility's gross revenues in calculating a proper return. Speaking for a unanimous Court, Justice Brandeis stated at page 399, 42 S.Ct. at page 356:
"In calculating whether the 5-cent fare will yield a proper return, it is necessary to deduct from gross revenue the expenses and charges; and all taxes which would be payable if a fair return were earned are appropriate deductions. There is no difference in this respect between state and federal taxes or between income taxes and others. But the fact that it is the federal corporate income tax for which deduction is made must be taken into consideration in determining what rate of return shall be deemed fair." (Emphasis added)
The following year, the Supreme Court again considered whether taxes should be included as an operating expense. In Georgia Railway & Power Co. v. Railroad Commission of Georgia, 262 U.S. 625, 43 S.Ct. 680, 67 L.Ed. 1144 (1923), that Court, citing Galveston, supra, held that taxes are properly treated as an operating expense.
The courts and regulatory agencies have consistently applied the rule of Galveston, supra, and Georgia Railway & Power Co., supra, to allow deduction of state and federal income taxes when ascertaining a fair rate of return. Shortly after these two landmark decisions were reported, they were cited with increasing frequency for the proposition that income taxes, both state and federal, are proper expense allowances. We would be going against the clear predominance of authority to hold otherwise.
For example, the Kansas Supreme Court in 1963 restated the rule in the case of Southwestern Bell Tel. & Tel. Co. v. Kansas State Corp. Comm., 192 Kan. 39, 386 P.2d 515, saying:
"State and federal income tax is the most important item of expense to be considered in the determination of a fair return. This exceeds all classified expense other than maintenance. Income tax expense amounts to approximately 52% of the company's net income. For every $1,000,000 the Company is allowed to earn as a fair return, an additional $1,150,000 plus, must be allowed for income tax expense. Income tax is charged as an expense in calculating the rate to the subscriber, and is not considered as equity capital or stockholders' *407 expense for the purpose of public utility regulation." (Emphasis added)
In Central Maine Power Co. v. Pub. Util. Comm., supra, the Maine Supreme Judicial Court, speaking of the proper treatment to be accorded income taxes in fixing public utility rates, observed:
"For the Company, the Commission, and the Court, the income tax is neither more nor less than an inescapable fact. Without question, the income tax is properly charged against utility operating revenues for rate making purposes. In other words, the return on the rate base must be computed after deduction of the income tax."
Myriad sources could be cited, and have been included in various briefs presented to us, all demonstrating the universal application of the principles laid down in Galveston, supra. The law on the proper treatment of state and federal income taxes for rate making purposes has been so long and clearly established as to require little further attention at this point in the history of taxation and regulation.
State and federal income taxes obviously constitute a cost of doing business and accordingly must be deducted from the gross revenue of a public utility as an operating expense in determining a proper rate of return for the utility, considered with all other pertinent factors. The petitioner cited 45 cases from 22 different jurisdictions, including the United States Supreme Court and the Federal Power Commission, showing that without exception income taxes are deemed legitimate operating expenses, and the Supreme Court of the United States has expressly held that there is no difference in state and federal income taxes in this regard. Galveston, supra.
Such overwhelming authority dictates that the Respondent Commission in its original Order No. 5471 correctly and properly applied the law of the land as laid down by the Supreme Court of the United States by considering the state corporate income tax as a proper operating expense in the course of determining the fair return to be allowed Gulf Power.
This application of the tax may not result in a full, dollar for dollar increase in the rate; it is to be considered (as other such expenses are) as another "cost of doing business," and whatever resultant increase thereby results will be reflected in the ultimate rate, the same as other operating expenses will affect the rate which will, however, be limited to whatever is found to be a fair return, here 8.06%.
The treatment of the corporate income tax as to utilities must be as we have set forth in accordance with all of the authorities: that the tax is an operating expense not to be treated separately BUT to be generally applied with all other expenses and factors involved in determining a fair return to the utility. Such overall consideration may, as we have said, result in the entire dollar tax not being a literal "pass through" of the total tax to the users. It will depend upon the total picture. The guiding "light" or consideration, as stated at the outset, is a fair return as constitutionally dictated. With this approach, the tax falls into perspective, as other operating expenses, and any resultant "sharing" between utility and user is thereby reflected in the determination of the rate demanded by a proper return. It is plain that it is not a direct, independent "one for one" allowance or express "deduction," as respondents apparently view it, but is a consideration with all others in arriving at a fair return for utilities as required by the U.S. and Florida Constitutions.
We note that in other litigation pending here a new rule relating to such matters appearing as Chapter 25-14.02 (b) and (c), Florida Administrative Code, has been *408 adopted by the Commission and provides, inter alia:
"25-14.02 Florida Corporate Income Tax.
(a)... .
(b) In any rate proceeding, the Commission will treat as an operating expense so much of the tax imposed by Chapter 220, Florida Statutes, as is necessary to prevent the allowable earnings of a regulated company from falling below the minimum fair, just and reasonable rate of return allowed by the Commission from time to time. In determining the amount of said tax to be treated as an operating expense in any rate proceeding, the Commission shall prescribe procedures suitable to each class of regulated companies.
(c) All accounting procedures and computations involved in the determination of rates, tariffs or charges for companies subject to the rate-setting jurisdiction of this Commission, including but not limited to the computation of operating income deficiencies and ultimate revenue requirements, shall be made in such a manner that the amount of tax cost to be borne by customers of those companies shall be no more than is required to assure those companies a minimum fair, reasonable and just rate of return."
The consideration of such rule will be determined within a short day by this Court in other cases now pending, and it is not our intention in this cause to make any pronouncement disposing of such other cases now pending.
Accordingly, the Commission's Order on Reconsideration No. 5617 of December 27, 1972, is quashed and the cause is remanded with directions to enter an order consistent with the views expressed herein and consistent with the Commission's later Order No. 10596 of March 26, 1973, adding a new Ch. 25-14, Fla.Adm.Code, in Docket No. 72707-Rule, as said Rule shall be hereafter construed by this Court in the several subsequent causes now pending before us expressly related to the new Rule. It follows that the cross-petition is denied.
It is so ordered.
ADKINS and McCAIN, JJ., concur.
CARLTON, C.J., concurs specially.
BOYD, J., dissents with opinion.
CARLTON, Chief Justice (concurring specially):
I concur fully in the majority opinion, based upon the overwhelming weight of authority as cited therein. I also wish to point out, however, that there are additional considerations which lead me to the same conclusion.
First, I do not think it would be equitable  or constitutional  for the State to require investors in public utilities to absorb the corporate income tax when the same requirement is not placed upon stockholders of other corporations. Undoubtedly, every other private corporation will treat the tax as an operating expense and offset that expense, at least in part, by price increases.
Second, the State is required  constitutionally  to allow a fair return to investors in State-regulated, public corporations. We are compelled, then, to reach the result herein in one way or another. If we held that the corporate income tax should not be treated as an operating expense, it would have to be paid from earnings available to stockholders. Rate increases would then have to be allowed, so that the earnings available to stockholders would be sufficient to still provide a fair net return to the investors.
Third, if the corporate income tax was required to be paid solely from earnings available to stockholders with no corresponding rate increase to guarantee a minimum fair return, we would not have a corporate *409 income tax; we would have a personal income tax levied only upon income earned through public utility investment and not upon other forms of income.
Finally, Public Service Commission Order No. 10596 has now provided for the treatment of the corporate income tax in a manner which is equitable to both public utility investors and consumers, and which is consistent with my views as briefly expressed above. This Order allows the tax to be treated as an operating expense, but only to the extent necessary to provide stockholders the minimum fair return on their investment.
BOYD, Justice (dissenting).
I respectfully dissent.
In the second Order of the Public Service Commission, it was determined that under the Florida Statutes, consideration of the question of inclusion of corporate income taxes in the rate base was premature at that time. It is my opinion that the second Order of the Commission declining consideration of that question was proper.
I must therefore respectfully dissent to the majority opinion.
NOTES
[1] A regulated public utility is, of course, entitled to an opportunity to earn a fair rate of return on its invested capital. City of Miami v. Florida Public Service Commission, 208 So.2d 249 (Fla. 1968). Failure to allow the utility the opportunity to earn a fair rate of return would violate the rights to due process, to just compensation for taking of property and the right to possess and protect property. Fla. Const., Art. I, §§ 2, 9; Art. X, § 6, F.S.A.; U.S.Const. Amends. V and XIV.
[2] El Paso Natural Gas Co., 29 PUR3d 469 (1959); Virginia v. Virginia Electric & Power Co., 211 Va. 758, 180 S.E.2d 675 (1971); Southern New England Tel. Co. v. Conn. Pub. Util. Com., 88 PUR3d 558 (1970).