PER CURIAM.
This matter involves a disciplinary proceeding in which the Judicial Qualifications Commission, constituted under Article V, Section 12, Florida Constitution, has found Petitioner Justice Joseph A. Boyd, Jr., guilty of conduct unbecoming a judge and has recommended to the Supreme Court that he be removed from office. Petitioner seeks herein to have the Court reject the recommendation or modify it.
The Commission gave notice to Justice Boyd on September 30, 1974, that he had engaged in conduct unbecoming a member of the judiciary in that the role he played as a member of the Supreme Court of Florida in the case of Gulf Power Company v. Bevis et al., reported at 289 So.2d 401, was not free from impropriety and appearance of impropriety; that his conduct in said case gave credence to and justified the impression that he was improperly influenced by communications with one of the attorneys representing parties in the case, one Edwin L. Mason of Tallahassee, Florida, which communications were both ex parte and dehors the record; that his conduct and ex parte communications with the above named attorney justified the impression that said attorney improperly influenced him “and that both of your opinions in the case were affected by the position or influence of said attorney or other persons”; and that his aforementioned conduct has caused public confidence in the integrity and impartiality of the Supreme Court to be eroded.
These charges were bottomed primarily upon Canon 3, subd. A(4) of the Code of Judicial Conduct:
“Canon 3—
“(4) A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider ex parte or other communications concerning a pending or impending proceeding. A judge, however, may obtain the advice of a disinterested expert on the law applicable to a proceeding before him if he gives notice to the parties of the person consulted and the substance of the advice, and affords the parties reasonable opportunity to respond.” (Fla., 281 So.2d 21, 24)
In the evidentiary hearings that ensued the notification to Justice Boyd that his conduct was being inquired into as described, it appears that in Gulf Power Company v. Bevis, 289 So.2d 401, the case was orally argued in the Supreme Court on June 7, 1973, before a five member panel consisting of Chief Justice Carlton and Justices Adkins, Boyd, McCain and Dekle; that thereafter on July 16, 1973, Justice Boyd and attorney Mason, who had filed amicus briefs for the St. Joe Telephone and Telegraph Company and the Gulf Telephone Company, played golf together at the Killearn Country Club in Tallahassee, Florida. Mason testified before the Commission that on that occasion he gave *15 Justice Boyd a written memo in the form of a proposed opinion to be used in Gulf Power v. Bevis as a majority opinion to reverse the Public Service Commission in favor of the power company. Mason deposed that he gave it to Boyd either before they left Boyd’s home to- go to the golf course or on their return from the golf course; Boyd denied that he ever received the ex parte memo from Mason, that he did not solicit it or in anywise suggest that it be prepared and given to him. Mason testified he got the impression from Boyd in a prior golf game with him that Boyd would appreciate such a memorandum to help him prepare the majority opinion for the panel reversing the Public Service Commission which he had been assigned to prepare.
Mrs. Elizabeth Potts, secretary to Justice Boyd, testified that Justice Boyd told her that Mason had given him the memo. Boyd denied this and stated that Mrs. Potts had been hostile to him and was actuated improperly toward him either from psychiatric or family problems or through a vindictive motive in giving such testimony which was induced by others who sought revenge upon him for exposing the extraneous memorandum.
Boyd’s research aide, Roger A. Schwartz, testified that Boyd called him into his office in July, 1973, greatly agitated, stating that he had discovered on his desk among the file papers of the Gulf Power v. Bevis case a written memo of several pages length that purported to be a proposed opinion to be used in the power company case in the company’s favor. This discovery by Boyd, according to Schwartz, occurred in July shortly after his golf game with Mason and before the August recess of the Supreme Court.
Schwartz testified that Boyd told him to check the authenticity of the memo, see if it had been properly filed in the Clerk’s office as a pleading or brief in the case and served on other counsel in the case. This Schwartz testified he did and found it was an extraneous communication which was improperly placed before Boyd without being properly filed. Boyd testified that at the time he discovered the extraneous memorandum in his office, it put him in great fear of what might happen to him in terms of accusations of judicial misconduct if it became known that the extraneous memo had been in his possession because the extraneous communication’s mysterious appearance in his office in itself implied impropriety ; Schwartz testified that in checking out the contents of the memo he found that it agreed with the power company’s briefs filed in the Gulf Power Company v. Bevis case. He also testified, with Boyd’s testimony corresponding, that Justice Boyd decided that the best course then to pursue was to destroy the memo rather than to hazard bringing it to the attention of the Chief Justice of the Supreme Court and other members of the Court or to a grievance committee of The Florida Bar, or to the Judicial Qualifications Commission because of the possibility Boyd’s connection with the memo could not be satisfactorily explained to the point of exonerating him of impropriety and that he might be unjustly accused of improper possession of it. Accordingly, late in July, 1973, Boyd, in Schwartz’s presence, flushed the memo down a toilet in a men’s room of the Supreme Court. Boyd also testified he had Schwartz commit to memory as far as possible the contents of the memo before it was destroyed. Schwartz testified that he, along with David- LaCroix, Chief Justice Carlton’s research aide, did this. Boyd testified his purpose in having this done was for these aides with this knowledge to determine later on if some other justice had received the same memo and used it in framing a majority opinion reversing the Commission. By this means, Boyd testified, it might be possible to “trap” another justice improperly using the extraneous memorandum.
Thus, there is contradictory evidence as to whether Mason gave Boyd the memo with the latter’s knowledge, however, it is quite clear from the evidence that Boyd *16 did not follow the memo which was intended to be a model for an opinion reversing the Public Service Commission in the Gulf Power v. Bevis case. Instead, on October 19, 1973, Boyd filed and put into circulation for the concurrence of the majority of the panel, an opinion that affirmed the Public Service Commission contrary to the views of the power company. There is undisputed testimony that Boyd’s proposed opinion for the majority affirming the Public Service Commission was the same in substance as his dissent in the case. See 289 So.2d at page 409. Boyd dissented after a dissent by Justice Dekle to Boyd’s original opinion was recast as a majority opinion.
Boyd’s opinion as reflected by his dissent in the power company case was to the effect that a reversal of the Commission and allowing to “pass through” the state’s corporate income or profits tax to the electric company’s ratepayers would be premature in the Gulf Power Company v. Bevis case. He would have affirmed the Public Service Commission.
The evidence disclosed that after Boyd’s majority opinion was put into circulation, Justice Dekle dissented to it. According to the testimony of Schwartz, Boyd’s research aide, and David LaCroix, Chief Justice Carlton’s research aide, the Dekle dissent bore a striking resemblance to the extraneous memo that Mason said he gave Boyd.
While Dekle’s dissent was circulating along with Boyd’s proposed majority opinion, there occurred a significant event that heightened the suspicion impropriety had occurred in the Court because of the Mason ex parte communication. Justice Dekle, on November 30, 1973 when he was the only judge remaining in the Supreme Court Building on the afternoon of that date, went to Justice McCain’s office and had the following interoffice memo to Justice McCain prepared by Justice McCain’s secretary, Mrs. Barbara Williams, reading as follows: “Judge Dekle asked me to write you this note: ‘HPD says that he thought you were with him on his “dissent”; that Ed Mason spoke to him on it but missed seeing you.’ ” In the Judicial Qualifications Commission inquiry relating to the conduct of Justice Dekle it will be noted that Justice Dekle admits he received from Mason what the latter said was an identical copy of the ex parte memorandum Mason claims he gave Justice Boyd.
It appears in the evidence that this Dekle to McCain interoffice memo was leaked to the press and then became the subject of considerable furor in the Court, resulting in a security meeting of the Court with its aides and secretaries. Justice Boyd testified that after the Dekle to McCain memo came to light and the press stories concerning it ensued, he came to the conclusion that Mason was the person who had surreptitiously slipped the ex parte opinion-memo either into his office or at the time of his golf game with Mason on July 16, 1973, that Mason had slipped it into the file of the Gulf Power v. Bevis case which Boyd then had at his home along with other court files. Boyd testified that Mason came into his home with him both before and after the golf game and had opportunity to slip the ex parte memo in the case file without Boyd noticing it. Mason denied this and testified that he gave it directly to Boyd at his home on that date and that Boyd then accepted it.
Boyd testified that sometime in December, 1973, or in early 1974, he decided that because of the furor and suspicions of impropriety surrounding the Gulf Power v. Bevis case, particularly that part which was generated by the Dekle to McCain interoffice memo, it was then wise for him to disclose to others what he knew about the ex parte Mason memo. In the meantime, Justice Dekle’s dissenting opinion had been agreed to by the three other members of the panel who had heard the oral argument in the case and was about to become the majority opinion in the case. Boyd then disclosed through Carlton’s aide La-Croix to the Chief Justice his information about the ex parte memo. Later, he dis *17 closed this information to a newspaper reporter, Martin Dyckman, of the St. Peters-burg Times. He testified that he also later imparted this information to Justice B. K. Roberts and Justice James C. Adkins, and to Richard T. Earle, Chairman of the Judicial Qualifications Commission. Justice Adkins confirmed the fact that Boyd had told him about the memo prior to the disposition of the Gulf Power Company v. Bevis case.
The up-shot thereof resulted in the panel in the case, at the behest of Chief Justice Carlton and Justice Roberts, modifying the proposed Dekle majority opinion which would have reversed the Public Service Commission and “passed through” to Gulf Power’s ratepayers all of the state’s corporate income or profits tax. Instead, the majority opinion as amended and finally released postponed a determination in that case as to whether the state statute imposing a state corporate income tax and the Public Service Commission’s rule on the subject obviated the complete passing through to the ratepayers of all of the corporate income tax and left the question open for subsequent decision in Public Service Commission cases then pending in the Court.
Justice B. K. Roberts testified in this inquiry and pointed out that after all of the furor and suspicion of impropriety in the original case, the Mason ex parte memo was not followed, but that in the later Public Service Commission cases heard by six justices including the panel in the original case except Justice Dekle and Justices Roberts and Ervin added, which dealt directly with the Public Service Commission’s rule and the corporate income tax statute, the six-member Court held that pursuant to the rule there must be a tax sharing between the utility companies and its stockholders with the ratepayers and not a complete “pass through” of the tax to the ratepayers. See Gulf Power Company v. Bevis, Fla., 296 So.2d 482. Justice Roberts testified that the Mason memo had no improper impact upon the Court in its disposition of the question.
Insofar as the testimony of Mrs. Elizabeth Potts is concerned, we admit it has puzzling aspects. Justice Boyd’s counsel claimed she played the role of traitress to Justice Boyd. She gave still another version as to the appearance of the ex parte memo in Justice Boyd’s office. She said she found it on her desk one morning when she came to work and that she took it into Boyd’s office and gave it to him with Schwartz present.
The Judicial Qualifications Commission found as a result of its inquiry of Justice Boyd that “he engaged in an ex parte communication with one Edwin L. Mason of Tallahassee, Florida, concerning the issues in the case and at that time agreed to accept from Mason the latter’s assistance, in the preparation of an opinion to be submitted to the Court for approval and concurrence,” knowing that Mason was an attorney who had filed in the case two amicus briefs on behalf of telephone utility companies; that Boyd “received and accepted from Mason on or about July 16, 1973, a written document which was in the form of a court opinion or memorandum of law suitable for inclusion or use otherwise in the preparation of an opinion for the Court in the Gulf Power case”; that Boyd used the Mason memo in the preparation of a draft or proposed opinion in the Gulf Power case, or allowed his research aide, Roger A. Schwartz, to use it; that Boyd, “in complicity with the said Schwartz, destroyed the ex parte document which Mason had submitted to him and thereby disposed of evidence of . the unethical conduct of the said Mason, and failed to report the same to the proper officials of The Florida Bar” and . . . “destroyed or caused to be destroyed by the said Schwartz all other written evidence possessed by him including but not limited to notes, memoranda and preliminary drafts of opinions based upon the Mason document, and otherwise sought to conceal *18 his own judicial misconduct and the aforesaid impropriety or appearance of impropriety!’; that Boyd “learned or acquired information from the said Schwartz and others, reasonably suggesting that another Justice of the Supreme Court who was participating with Respondent [Boyd] in the Gulf Power Company case, had made use of the same ex parte document which had been provided Respondent [Boyd] by Mason in the preparation of a proposed opinion submitted by said other Justice for the concurrence of the other Justices of the Supreme Court, well knowing that the action by said other Justice on the Court constituted judicial misconduct and a violation of the Code of Judicial Conduct, and nevertheless Respondent [Boyd] failed promptly to report the same to the Florida Judicial Qualifications Commission”; that “as a result of information learned or suspected by members of the press there occurred widespread publicity inferring, if not directly charging, that ex parte actions by interested persons with members of the Court had influenced or sought to influence the Court in any decision which it might thereafter render in the Gulf Power Company case.”
Giving all due consideration to those findings of the Judicial Qualifications Commission, nevertheless, we cannot overlook that Justice Boyd’s action belied the fact that he was influenced improperly in the decision of the case or that actually he ever personally used the ex parte Mason communication in the preparation of any opinion for the Court. He never released an opinion that agreed with the Mason memo — in fact, what he did release affirmed the Public Service Commission. The fact that his research aide made two or three drafts of proposed opinions which agreed with the power company in the case is by no means conclusive of an improper intent because Boyd, according to all the testimony and what actually surfaced as his official opinions, at no time ever agreed to any of his research aide’s proposed hand-written opinions supportive of the side of the power company.
It is true that Boyd delayed bringing to the attention of the Chief Justice of the Florida Supreme Court and other members of the Court and other interested authorities the information he had concerning the Mason memo but his explanation of the delay has a certain degree of credence.
His explanation was that he was in great fear that his disclosure of the memo to the members of the Court would unjustly result in his becoming the subject of investigation for impropriety — a fear in fact that actually eventuated. He testified the security of the Court was poor, that leaks of its business and press reports thereof were a constant happening which had a deterring effect upon a Justice who might otherwise be willing to expose another’s impropriety. Moreover, Boyd maintained he had no clear evidence of who “palmed” the extraneous memo on him although he sus-picioned it was Mason after the Dekle to McCain interoffice memo surfaced since the memo mentioned Mason’s name. He did finally bring the matter to the attention of the Chief Justice and other members of the Court. He said that he did not bring it to the attention of the Florida Bar because he was never certain that it was Mason who originated the memo and that if he improperly charged Mason with originating the memo, he might be subject to a personal liability action. He said that he did finally give to members of the press corps, particularly Mr. Martin Dyckman, news correspondent for the St. Petersburg Times, all of the information he had concerning the Mason memo.
We take notice of the fact that in 1973 Justice Boyd was about to be involved in a re-election campaign the following year since the electoral process still obtains with respect to members of the Supreme Court. He testified he was desperately afraid at all times that a scandal would affect adversely his campaign for re-election. And *19 it is reflected in the record that in apparent desperation Boyd, near the end of his campaign, was drawn into making public through newspaper reporter questioning to the Miami Herald the circumstances surrounding the Mason memo as well as to another subject dealing with his going to Ochsner Clinic for examination which is extraneous to this inquiry.
There is some support of Boyd’s fears of leaks and rumors in the Court. For example, there is the testimony of Mason that he had rumor information as to the way the panel of Justices in the Gulf Power Company v. Bevis case had tentatively decided to vote in the case immediately after the June 7, 1973, oral argument therein. Mason’s rumor information coincided with the undisputed evidence on that score. Hence, Justice Boyd was not without some justification in believing that if he related to others his information concerning his connection with the ex parte memo, that it would become the basis of rumor leaks and he himself might become the target of investigation. That eventuality did occur for him with the attendant extreme humiliation and mental distress that is visited upon a judge in such an unhappy circumstance.
It has been suggested that Justice Boyd panicked or was frightened into disavowing and destroying the Mason memorandum and not using it to write a majority opinion reversing the Public Service Commission but that he nonetheless originally intended to do so. This inference hardly comports with the surrounding circumstances time-wise since Justice Boyd destroyed the Mason memo and decided to have none of it in July, 1973, long before the news media got wind of it and before others on the Court or elsewhere became privy to Boyd’s knowledge concerning it.
It appears in the record Boyd had been ill in 1973; that his father had also been ill and his father died in 1974. Boyd in 1973-74 was unquestionably under considerable mental worry and pressure. He was often a dissenter on the Court and imagined that because he was he had enemies in the Court. No doubt these were figments of his imagination but still his mental attitude may explain his rather bizarre behavior in destroying the memo. A more rationally oriented individual probably would have taken another tact than did Justice Boyd in respect to the Mason memo. Perhaps Justice Boyd would have himself, except for the pressures he was undergoing during the relevant time, primarily his impending political campaign and his and his father’s illness. However, there can be drawn no conclusive inference of corrupt misconduct from what he did under the surrounding circumstances. Certainly his opinions in the power company case do not square with an inference that he intended to use or did use the ex parte memorandum to side with the power company.
While his conduct is open to question, and what he did was bizarre, there is no clear and convincing proof that he actually solicited the memo from Mason and used it improperly. Mason’s testimony is subject to serious question. He said that Boyd solicited the memo from him at a prior golf game to the one they played on July 16, 1973. But there is no substantiation of any such prior golf game. The business records of Killearn Country Club where they played golf did not show they played there after the Gulf Power Company v. Bevis case was argued, except on July 16, 1973. So extensive a memo as Mason prepared (of some 13 or 14 pages) required several days preparation and there was no evidence of intervening time between two factually substantiated golf games for such preparation.
Although Boyd’s “trap” ploy was bum-blingly bizarre, it did lead to public exposure of the Mason memo via his confiding in Schwartz who brought in LaCroix who in turn informed Carlton of the “striking resemblance” of the memo to the Dekle dissent and set the stage for the leak of the Dekle to McCain interoffice memo to the press and the resulting furor and this inquiry. Boyd’s ploy set in motion a train *20 of events that produces an inference inconsistent with clear and convincing proof of guilty intent.
 In retrospect or hindsight, it may be concluded Justice Boyd used execrably bad judgment in not immediately reporting to the Chief Justice and other members of the Court the mysterious appearance in his office of the ex parte memo and in destroying it. It was his duty to divulge it, to disown it openly and forthrightly. It was his duty not to destroy the memo since it constituted the best evidence of its existence and contents — and was the most significant piece of evidence he had denoting an act of impropriety. We cannot condone his failure, in these respects, however much we sympathize, with him because of the pressures upon him and his fears at the time. The proper course for a Justice of a multi-judge court to pursue is to bring forward any improper attempt to influence him and the evidence he has thereof to the attention of his fellow judges and to others in authority who have a duty and responsibility to purge such influence and to mete appropriate discipline therefor.
The record in this cause demonstrates that Justice Boyd is a friendly affable fellow. It is evident that he has sought to please the public and impress others in doing so. At the time of the events under discussion, an excitable personality indicating an intellectual incapacity to cope with the responsibilities of his office and the pressures put upon it is shown. His asset of being the friendly fellow he is has helped get him into the difficulty. Obviously, Mr. Mason abused this friendship in discussing the case with him. The Gulf Power-Bevis case had much public interest and the view contra to the views of Mr. Mason was being expressed by a popular governor. It was a difficult case to begin with, and Justice Boyd was faced with the responsibility of writing a correct decision. In doing so, he was going t'o have to rule against a friend or a view popular to the public. It is no wonder that his resulting decision sought to delay the real question involved — at least until after his election.
This tends to substantiate the fear expressed indirectly in the Commission’s recommendations that some decisions are being reached by political, rather than purely legal considerations. Justice Boyd’s conduct has caused concern that he is a politician first, and a justice second — rather than the other way around.
Justice Ervin in his dissent in the Turner case (State ex rel. Turner v. Earle, 295 So.2d 609 (Fla.1974)), made the following comments:
“Pecadillos of a judge should be ignored by the Commission unless they cumulatively reflect upon the present quality of his judicial service or render him an object of disrespect and derision in his role to the point of ineffectiveness.” * * *
“[I]f from the totality of the circumstances relating to a judge’s character there is strong reason to infer from previous misconduct that he has present weakness of judicial character and possible predilection to corruptive influences, the Commission should take the same into account.”
Nevertheless, we do not find from the evidence clear and convincing proof of Justice Boyd’s dishonesty or moral turpitude in this inquiry warranting his removal from office. We do not find that he was corrupt or venal — or that he accepted any bribe — or that he used the Mason memo to favor Mason or the companies he represented. Neither is it clear and convincing from the proofs that Justice Boyd originally intended to use the Mason memo but aborted such intent because of some compelling intervening fright or fear of public exposure. Rather, Justice Boyd’s version of his descovery in July, 1973, of the mysteriously appearing memo and his destruction of it shortly thereafter appear at the time to have been unaffected by any outside threatening circumstance or fear of public exposure.
*21 We have no comprehensive body of law relating to the discipline of Judges. However, this Court many times has decided disciplinary cases relating to attorneys. Analogously, the principles enunciated in those cases would appear applicable to a degree in judge discipline cases. It is held in the attorney cases that misconduct must be established by clear and convincing evidence free of substantial doubts or inconsistencies ; something more than a preponderance or an inference. See The Florida Bar v. Rayman (Fla. 1970), 238 So.2d 594. In that case, two lawyers were charged by clients with soliciting from them money to be used to bribe a judge to rule in their favor as heirs of a decedent. The lawyers denied they received the money and pointed out inconsistencies and contradictions. This Court in the Rayman case relying on several cases in this and other jurisdictions held that evidence to sustain a charge of unprofessional conduct against a member of the bar where in his testimony under oath he has fully and completely denied the asserted wrongful act, must be clear and convincing and that degree of evidence does not flow from the testimony of one witness unless such witness is corroborated to some extent either by facts or circumstances. As we have previously outlined, Mason’s testimony as to a first golf game with Justice Boyd could not be substantiated and counsel for the Judicial Qualifications Commission freely admits it could not prove any such prior game between the two occurred. Mason was vague as to whether Justice Boyd solicited an opinion-memo from him for use in Gulf Power Company v. Bevis, supra, or whether he (Mason) volunteered it after he claimed Boyd told him he was puzzled as to how to prepare the opinion and needed help. We have also pointed out conclusively and in contradiction to the Commission’s charge, that Boyd himself at no time used the Mason memorandum for his opinion in the case but very early after he got the memo destroyed it which seems to negate that he ever intended to use it in preparing his opinion.
This Court has stated also in attorney disciplinary cases that “not only a wrong, but a corrupt motive be present to authorize disbarment”. The Florida Bar v. Thomson (Fla.1973), 271 So.2d 758, 761; accord Zachary v. State, 53 Fla. 94, 43 So. 925 (1907) and Gould v. State, 99 Fla. 662, 127 So. 309 (1930).
Lawyers are disbarred only in cases where they commit extreme violations involving moral turpitude, corruption, defalcations, theft, larceny or other serious or reprehensible offenses. We agree Judges should be held to even stricter ethical standards because in the nature of things even more rectitude and uprightness is expected of them lawyers. Cf. Cincinnati Bar Association v. Heitzler, 43 Ohio St.2d 214, 291 N.E.2d 477, 482 (1972). But they too should not be subjected to the extreme discipline of removal except in instances where it is free from doubt that they intentionally committed serious and grievous wrongs of a clearly unredeeming nature.
In support of our conclusions herein, we refer also to our decision in the Inquiry Concerning Justice Dekle rendered today. Our decision there sets forth the further reasons and authority for our decision in this inquiry which need not be repeated here.
In The Florida Bar v. Rayman, supra, it was said of the two lawyers there involved :
“Both of these respondents have had lengthy careers as attorneys and have established reputable positions in their home communities. There appeared to attest to their credibility and integrity no less than three circuit judges before whom the respondents had practiced for many years as well as the senior judge of the probate court wherein was pending the estate matter out of which the herein charges allegedly arose. . All of these distinguished jurists declared their full and total confidence in the reliability *22 and integrity of the respondents; and while, of course, such attestations are not controlling in disciplinary matters of this kind, they are deserving of serious consideration as we perform the delicate function of reconciling the conflicts of evidence such as those found in this record.”
Justice Boyd concludes in the Turner case with these words:
“Those who cannot stand the bright light of public scrutiny should not hold judicial office.”
Perhaps one’s views on that may be dependent on whether he is shining the light or whether the light is shining on him. That light now shines on Justice Boyd.
The record fails to show that he is corrupt or immoral. We note with satisfaction that these proceedings have other redeeming features — the justices are less apt to be approached privately by counsel. Justice Boyd now has an experienced aide who served with one of the outstanding appellate judges for fourteen years. When we weigh in the balance all factors in this case, we think it would be too extreme to remove him from the bench. To do so on this record would leave us with the unresolved but lurking suspicion that in view of the doubts as to his guilt of corrupt motive, we would possibly be making him a tragic martyr- — a suspicion that would be difficult for us to live with in good conscience.
Justice Boyd contends that he cannot be removed or disciplined for any act of misconduct which occurred prior to the commencement of his present term of office. That contention is rejected. In Re Sarisohn, 26 A.D.2d 388, 275 N.Y.S.2d 355; In Re Kelly (Fla. 1970), 238 So.2d 565. Likewise, his contention that he is deprived of due process of law or of a violation of his constitutional rights is rejected.
In conclusion, we find Justice Boyd guilty of impropriety in the particulars hereinbefore noted, and we publicly reprimand him therefor, but do not find him guilty of corrupt motive.
It is so ordered.
ERVIN (Retired), Supreme Court Justice, JOHNSON, District Court Judge, and DuVAL, MCDONALD, MASON and NELSON, Circuit Court Judges, concur.
ADAMS (Retired), Supreme Court Justice, dissents with opinion.