ZEHMER, Judge.
We review by appeal two orders of the Florida Public Service Commission that denied in part the request by Marco Island Utilities for an increase in the rates charged for providing water and sewer services. Order No. 17600, issued after a full evidentiary hearing, granted MIU some relief in respect to its rates but declined to include in the cost base the actual interest cost of 16.1% for the $30,000,000 long-term financing arranged by MIU and its parent organization, and instead allowed MIU only 14.25% interest on such indebtedness. Order No. 18476, entered on the motions for rehearing, granted MIU some additional relief but reaffirmed the ruling on long-term interest costs. MIU’s sole point on appeal contends that the ruling allowing only 14.25% for interest cost is not supported by competent, substantial evidence and is contrary to law. The Office of the Public Counsel, having been permitted to intervene in the proceedings below on behalf of the Citizens of the State of Florida, cross-appeals this ruling, arguing that competent, substantial evidence will support only a reasonable and prudent interest cost of 11%'to 11.5%. Finding error in the Commission’s ruling, we reverse on the Utility’s point on appeal and remand for further proceedings. We affirm the issue raised on the Citizens’ cross-appeal.
The material facts relevant to this single issue are relatively simple and for the most part undisputed. Marco Island Utilities furnishes water and sewer facilities and services to customers on Marco Island in Collier County. It is a division of Deltona Utilities, Inc., a subsidiary of Deltona Corporation. Deltona Utilities also operates a number of other utility companies around the state. In 1985 MIU applied for a rate increase based on a number of changed factors, including significant capital investments made in the recent past and large capital investment needed in the near future in order to provide necessary quality service to its customers, construct improvements required by regulatory agencies, and meet its existing debt obligation. The Commission required MIU to use a test year ending March 31, 1985.
Regarding the debt obligation, the record establishes that during 1984 MIU and other operating divisions of Deltona Utilities entered into a first mortgage bond-financing transaction in the amount of $30,000,000. The primary purpose of this transaction was to retire an existing $18,000,000 indebtedness that was then overdue and in default, and also to provide additional working capital for necessary capital expenditures. The bond financing was for a term of ten (10) years, commencing in December 1984, at 15.5%. Adding an additional 0.6% for cost of obtaining this financing, the total actual cost amounted to 16.1% annually, and this amount was confirmed and recommended as allowable by the Commission staff. The financing was arranged in the summer of 1984 with a consortium of insurance companies, who in turn had issued to various investors guaranteed income securities that could not be prepaid by the insurance companies. Accordingly, the bond financing included provisions restricting prepayment and retirement of the debt to an involuntary conversion of Delto-na Utilities (e.g., condemnation, Act of God, destruction of property, etc.), and imposing a prepayment penalty of 15.5% if retired during the first year and thereafter declining by approximately 1.55% annually. The bonds also included restrictions that would preclude MIU and Deltona Utilities from voluntarily prepaying the indebtedness without the consent of the bondhold *1327 ers, and even such consent prepayment would activate the prepayment penalty provisions. Donald McNelley, vice-president and treasurer of Deltona Corporation, described the transaction in considerable detail and explained the critical circumstances that required this refinancing in 1984. He agreed, however, that without the restrictions, refinancing could be achieved currently at about 11% to 11.5% annual interest, and this was consistent with the testimony of other witnesses before the Commission.
In Order No. 17600, the Commission made the following findings of fact in respect to the cost of capital:
Taking into account closing costs, the utility states that the cost of debt should be the cost rate for the first mortgage bonds, or 16.10%. The OPC states that a reasonable interest rate can be calculated by averaging the prime rate, 8V2% over the thirteen months from November 1985 through November 1986 and adding 2/2% — resulting in a cost rate of 11%.
Our review of the evidence shows that Deltona Utilities, Inc., on December 1, 1984, entered into a first mortgage bond financing in the amount of $30,000,000. The financing was at 15.5% for a term of ten years, but the effective cost rate was 16.1% when the cost of placing the debt was included. Although the parent company guaranteed the debt, the financing is a debt of the utility group.
The utility presented evidence that showed that it was not allowed to refinance the debt without obtaining the agreement of the bondholders, and any such refinancing would incur a substantial penalty. Although it is fairly standard policy to require a penalty for refinancing, we do not think it is proper or appropriate for the utility to enter into an agreement which allows refinancing only with the consent of the bond holders. Therefore, we will not accept this restriction, and we will treat the utility as if it could refinance the debt.
Also, we note that the original financing was the prime rate plus 2.50%, plus approximately .60% for issuance costs. Further, we note that the prime rate, as of December 1, 1984, was 11.25%. Therefore, if the utility had refinanced the debt at that time, an appropriate cost of debt would have been the prime rate of 11.25%, plus the spread of 2.5%, plus the cost of issuance of approximately .50%. Therefore, instead of using the inflated cost of debt of 16.1%, we believe the more appropriate cost rate for debt is 14-25%.
[Emphasis added.] The Commission used this 14.25% interest rate in calculating allowable cost of capital in the utility’s rate base. Ruling on MIU’s application for rehearing, the Commission ruled in part in Order No. 18476:
For issue No. 1, the utility argued that the Commission had made a mistake when it did not allow the actual cost of the first mortgage bonds. However, a review of the evidence and Order No. 17600 shows that this Commission found that it was neither proper nor appropriate for the utility to enter into an agreement which allows refinancing only with the consent of the bondholders. We also found in Order No. 17600 that it would have been proper to refinance as of December 1, 1984, when the prime rate had dropped to 11.25%. Therefore, the utility’s cost of debt was correctly calculated to be 14.25% when the spread of 2.5% and the cost of issuance were added to the prime rate, and no mistake has been made.
[Emphasis added.]
It appears, therefore, that the Commission made two interrelated rulings that must be discussed on this appeal. First, we address the findings that it was not proper or appropriate for the MIU to have agreed to the restriction on retirement except with the consent of the bondholders, and that the debt would be treated as if it could have been refinanced December 1, 1984. Second, we address whether it was permissible for the Commission to settle upon the 14.25% interest rate in its rate-base calculations.
*1328 The Commission relies on the following provision in section 367.081(3), Florida Statutes (1985):
The Commission, in fixing rates, may determine the prudent cost of providing service during the period of time the rates will be in effect following the entry of a final order relating to the rate request of the utility and may use such costs to determine the revenue requirements that will allow the utility to earn a fair rate of return on its rate base.
[Emphasis added.] This statutory authority, the Commission contends, empowers it to pass on whether the utility acted prudently in entering into the bond financing with the restriction requiring bondholder consent. Specifically, it argues, “The effect of the penalty and the restriction is to prevent the Utility from obtaining more favorable financing which was later available. This financing, according to witness McNelley, was available at the ‘11% to 11.5% range.’ (TR-960.) The utility did not show either the necessity or desirability of the prepayment penalty and restriction. Taken in the context of the evidence in the record, it may be seen that the Utility ‘locked in’ an excessive rate of interest during a time of high interest rates.” (Commission’s Answer Brief, p. 6). The Commission thus concludes that the evidence supports its finding that 14.25% is a reasonable rate of interest for such financing since there was evidence presented by MIU that the debt actually cost 16.1% and evidence through Citizens’ witness Larkin that the appropriate rate was 11%. Characterizing its decision as one based on a conflict in the evidence, the Commission argues that it has a duty to determine reasonable cost within the range of those suggested by the evidence, citing Gulf Power Co. v. Florida Public Service Commission, 453 So.2d 799 (Fla.1984); United Telephone Co. v. Mayo, 345 So.2d 648 (Fla.1977); Florida Retail Federation v. Mayo, 331 So.2d 308 (Fla.1976); and Citizens of State v. Florida Public Service Commission, 488 So.2d 112 (Fla. 1st DCA 1986).[1]
We recognize that under the cited decisions the burden is on MIU to demonstrate that the Commission’s order is invalid, arbitrary, or unsupported by the evidence, and that we will not reweigh the evidence and will not overturn the order because we may have arrived at a different result had we made the original decision. Indisputably, it is the Commission’s prerogative to “evaluate the testimony of competing experts and accord whatever weight to the conflicting opinions it deems appropriate.” United Telephone Co. v. Mayo, 345 So.2d 648, 654.
The issue before us, however, cannot be decided by simply choosing between supposedly conflicting opinions, as the Commission contends. In this instance there is really no conflict in the two experts’ opinions when the basis and reasons therefor are carefully examined. Rather, the issue must be determined by correctly applying the relevant principles of law to the actual facts, and not on the basis of assumed facts by treating established facts as if they did not exist. The law is well established that the Commission is not allowed to ignore an existing fact establishing with certainty an expense item that admittedly will affect future rates; such expense item cannot be ignored even though not properly included under the methodology employing the critical time frame of the test year. “For it is a correct result which is the goal of the determination and not merely the means or formula used in arriving at the answer.” Gulf Power Co. v. Bevis, 289 So.2d 401, 406 (Fla.1974). Thus, the facts relied on by the Commission in reaching its decision must *1329 be supported by competent, substantial evidence or the appealed order cannot be approved. E.g. North Florida Water Co. v. City of Marianna, 235 So.2d 487, 489 (Fla.1970) (“Governmental bodies authorized by law to pass upon utility rates must base their decisions upon evidence and not upon some undisclosed factor or factors. A reviewing body’s mere opinion as to what is a proper rate of return is not a valid substitute for evidence.”); General Development Utilities, Inc. v. Hawkins, 357 So.2d 408 (Fla.1978) (it was appropriate for the Commission to use an actual rather than hypothetical eost of debt, but inappropriate to select a cost/debt ratio not supported by evidence in the record).
Regarding the Commission’s finding of fact that it was not proper or appropriate for MIU to have agreed to the provision requiring the bondholders’ consent before calling the bonds, the only evidence in this record on the propriety of that provision comes from McNelley, who explained the reasons for the provisions in the bonds, and Larkin, who acknowledged that he had seen debt instruments entered into by utilities in the early ’80s that precluded recalling the debt for 5 years, although he was of the view that most instruments allow the calling of the debt. No Commission rule nor any evidence of Commission policy disallowing bondholder-consent provisions was presented. No evidence was adduced that it was improper or inappropriate for Deltona Utilities to include such provisions in the mortgage bonds under the circumstances then existing. The evidence is undisputed that Deltona Utilities was in default on $18,000,000 of indebtedness in the summer of 1984, and since the lender holding it had given a short extension of time to repay it, Deltona Utilities was under strong compulsion to replace that debt as quickly as possible. Under the terms of the $18,000,000 indebtedness, the interest charge floated at 2% above prime, and prime had gone above 20% on some occasion in prior years, causing the utility to have a widely fluctuating interest cost. In an effort to obtain more stability and predictability in its interest cost, Deltona Utilities had pursued various avenues for fixed-interest financing, and found this mortgage bond transaction to be the most desirable under the circumstances. In summary, there is no evidence in this record to establish the impropriety or inappropriateness of including the provision for bondholders’ consent in this transaction, and this finding of fact by the Commission cannot be sustained.
Addressing next the Commission’s finding that it would not accept the bondholders’ consent restriction but would treat the utility as if it could refinance the debt, this finding is contrary to the proof of the actual facts and is not supported by any evidence of record. Certainly, since the actual fact is that the bonds could not be recalled for up to 10 years without the bondholders’ consent and prepayment of a penalty, the Commission was not free to ignore this fact and base its decision on a hypothetical assumption that simply could not occur. Since the consent provision was valid and enforceable by the bondholders, and since there is no basis in this record for the Commission to disregard that provision, it was incumbent on the Commission to view the bond-financing transaction as being fixed in its terms without the opportunity to renegotiate for a lower interest rate.
Finally, we discuss the Commission’s decision to use the 14.25% interest rate based on refinancing at December 1, 1984. Three witnesses testified on this subject: Larkin, Quesada, and McNelley. Larkin’s opinion as to the appropriate interest rate was based on his belief that the mortgage bond financing contained no prepayment penalty and assumed that the indebtedness could be refinanced at any time. For this reason, he stated that it was immaterial what the prime interest rate was in 1984, and opined that using an average prime rate over the 13-month period from November 1985 to November 1986 of 8.5%, accepting as reasonable an interest rate of 2.5% above prime, resulted in an allowable interest rate of 11% for long-term debt cost. Quesada testified that his rate-base calculations on behalf of the utilities included the bond debt financing at its actual cost of 16.1%, and that according to his understanding this figure was based on 2.5% above prime. He was not involved in *1330 the bond financing transaction. McNelley testified that at the time the bond financing transaction was agreed to in August 1984 the prime interest rate was at 13% to which was added 2.5% to get the agreed rate of 15.5%. He agreed that at the time of his testimony the market for refinancing was 11% to 11.5%. He explained that the prepayment penalty provisions made it too costly and imprudent to refinance unless the effective interest was well below 11%, and for this reason the utilities had not approached the bondholders with a proposal for their consent to call the bonds and refinance. Prom this, it is readily apparent that there was little if any dispute about the allowable interest rates at any given time. The critical question is the particular time to be selected for rate-making purposes.
The Commission’s selection of December 1,1984, as the effective date of refinancing is not sustained by the record. The undisputed evidence establishes that the mortgage bond financing was negotiated during the summer of 1984 and that Deltona Utilities became locked in to the terms of the bond issue in August 1984. At that time, the prime rate was at 13%, and the financing was based on 2.5% above prime plus costs. Each witness agreed to the reasonableness of financing at 2.5% above prime. Larkin’s opinion was based entirely on his belief that there were no prepayment penalty provisions in the bonds. Neither he nor any other witness, however, testified that it was imprudent or unreasonable to enter into a financing agreement in August 1984 that provided for 15.5% interest, that is, 2.5% above prime. Thus, the record is uneontroverted that the financing terms became fixed at that rate of interest well before December 1984, that the 16.1% actual cost of financing would have to be paid by the utility from December 1984 for a term of 10 years (there was no evidence to suggest that the bondholders were likely to consent to a refinancing upon payment of a penalty), and that there was no evidence that these terms were imprudent when entered into in August 1984 under the then existing conditions.
We could agree with the Commission that 14.25% would be a reasonable rate if in fact the refinancing had occurred in December 1984. The appealed orders cannot be affirmed on that basis, however, because the critical date of refinancing established by undisputed evidence was in August, not December, 1984. Since the Commission’s ruling on this issue is based on assumed facts that are not supported by competent, substantial evidence in the record, it must be reversed.
The Citizens argue on cross-appeal that instead of 14.25%, the Commission should have found a prudent interest rate would be 11-11.5%. The Citizens’ argument, however, is based entirely on the premise that the financing documents contain no provision for a prepayment penalty or consent of bondholders that would prevent a refinancing of the indebtedness. Since that premise is demonstrably false (see note 1, supra), Citizens’ entire argument must necessarily fail. The issue raised on the cross-appeal is affirmed.
This cause is remanded to the Commission for further proceedings in accordance with this opinion.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
ERVIN, J., concurs.
WENTWORTH, J., concurs in conclusion.

. We reject the Citizens’ argument that there is also a dispute in the testimony regarding whether the bonds included a prepayment penalty or a consent of bondholders restriction on retirement of the debt. We recognize that the Utilities’ witness Quesada and the Citizens' witness Larkin testified that so far as they knew no such provisions were in the bonds, but their testimony also revealed they were not entirely sure about these facts. Since McNelley actually handled the bond transaction and testified with precision about thfese provisions, and since his testimony was obviously accepted by the Commission in its order and brief on appeal, we find no legal basis to disregard the Commission’s finding of fact and treat the bonds as if no such provisions were included.